Sally J. REED, Beverly Pitts, Orestes Mitchell, Jr., W. F. Enright, William M. Morton, Trustees of the George Bode, Jr., Benevolent Trust, Plaintiffs-Respondents,

v.

Thomas F. EAGLETON, Attorney General of the State of Missouri, Defendant-Appellant,

The City of St. Joseph, Missouri, Mildred L. Peters and Eleanor L. Thiehoff, Defendants-Respondents.

No. 50463.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1964.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 14, 1964.

Floyd M. Sprague, Charles S. Wilcox, Robert E. Douglas, St. Joseph, for plaintiffs-respondents.

Thomas F. Eagleton, Atty. Gen., J. Gordon Siddens, John H. Denman, Asst. Attys. Gen., Jefferson City, for defendant-appellant.

Charlotte P. Thayer, Carl D. Gum, Jr., Joseph H. Ernst, Grandview, for respondent Mildred L. Peters.

Maurice Pope, St. Joseph, for defendant-respondent, Eleanor L. Thiehoff.

WELBORN, Commissioner.

This action was brought by the Trustees of the George Bode, Jr., Benevolent Trust against Thomas F. Eagleton, Attorney General of the State of Missouri, the City of St. Joseph, Missouri, and, by the first amended petition, Mildred L. Peters and Eleanor L. Thiehoff, the heirs at law of Meta Bode Long, deceased, the sole heir at law of George Bode, Jr. By their petition, the trustees sought instruction and direction as to their powers and duties as trustees and also invoked the court's equitable jurisdiction "to vary the details of administration of this Trust." By the amended petition, they also sought a decree that Mildred L. Peters and Eleanor L. Thiehoff have no right, title or interest in any of the assets of the trust. The trial court entered its decree whereby it determined various questions raised by the trustees as to their powers and duties and also decreed that the powers of the trustees should be varied and amended in some respects. The court found that Peters and Thiehoff had no interest in the trust and ordered payment of their attorneys' fees from the trust assets. The Attorney General, who was made a party defendant in his official capacity because of his duties with respect to charitable trusts, has appealed from the decree. The issues on this appeal relate to the amendment of the powers of the trustees as fixed by the will of George Bode, Jr., and to the allowance of attorneys' fees to counsel for Thiehoff and Peters.

George Bode, Jr., a former resident of St. Joseph, died in St. Louis County on May 11, 1955. After litigation involving an attempt to establish an alleged lost will, Bode's last will, dated April 26, 1945, and a codicil thereto, dated May 8, 1945, were admitted to probate in St. Louis County on January 31, 1957. The will, after directing payment of funeral expenses and debts, left the estate to trustees for the benefit of the citizens of the City of St. Joseph. By the codicil, Bode bequeathed his personal effects to his niece, Mildred L. Peters and her husband, Charles A. Peters, with the residue to the trustees under the will.

The pertinent provisions of the will read as follows:

"SECOND: All the rest, residue, and remainder of my property, real, personal and mixed, of every kind and description and wherever the same may be situated, including any property as to which I have a power of disposition or appointment, I give, devise and bequeath in trust for the use and benefit of the citizens of the City of St. Joseph, State of Missouri, as hereinafter provided, to the trustees, selected in the manner hereinafter set forth, upon the following trusts, terms and conditions and for the uses and purposes hereinafter set out:

\* \* \* \* \* \*

"(2) (a) The trustees shall use the trust estate, principal and accumulated income, for the purchase and acquisition, from time to time, of land in the City of St. Joseph, Missouri, or its environs, to be used as sites and locations for public parks, playgrounds, athletic fields, including baseball diamonds and grounds, tennis courts, and a zoological garden, if financially possible, all for the use and benefit of the citizens of St. Joseph, Missouri.

"(b) The Trustees shall select the respective sites and locations and determine the respective particular use or uses, out of the general class of uses above set forth, to which they shall be put.

"I request the trustees in selecting the respective sites and locations and in determining the price to be paid therefor, to bear in mind my desire that the trust estate be utilized to confer the widest possible benefits among all the citizens of St. Joseph.

"(c) The property so acquired shall be transferred and conveyed by the trustees to

the City of St. Joseph, Missouri, or to a public agency thereof, authorized to take and to hold the same, subject to the following conditions:

"(1) That the city or public agency accepting the conveyance shall make the improvements necessary to carry out the purpose or purposes for which the conveyance is made and will adequately maintain the property for such purpose or purposes.

\*     \*     \*     \*     \*     \*

"(d) Without imposing any limitation upon the discretion of the trustees as to the time within which the various sites and locations herein contemplated shall be acquired, I request the trustees to bear in mind my desire that the benefits herein contemplated be made available to the citizens of St. Joseph within the earliest practical time."

The will provided for five trustees, two to be appointed by the judges of the Buchanan County Circuit Court, one by the judges of the Buchanan County Court, one by the Board of Education of the City of St. Joseph and one by the Mayor of St. Joseph.

The trustees were duly appointed and assets in the form of cash, real estate, bonds and corporate stocks were distributed to them. Distribution began in 1958 and was completed by December 31, 1959, at which date the corpus of the trust had a value of $3,432,926.68.

On October 14, 1958, the trustees wrote the Mayor of St. Joseph, the President of the Common Council and the President of the Board of Park Commissioners, advising those officials of the terms of the trust and requesting them to consider what additional lands were needed by the City of St. Joseph the source of funds available for the development of the land and the maintenance of the facilities, "bearing in mind that the Trustees under the Bode will are not authorized to disburse the Trust funds for such purposes."

In their first annual report for the period ending December 31, 1958, the trustees stated:

"As quoted above, Mr. Bode in his Will, requested that 'the benefits herein contemplated be made available to the citizens of St. Joseph within the earliest practical time.' If within the time suggested by Mr. Bode in his Will it is determined by the City of St. Joseph and its public agencies and officials responsible for the acquisition and maintenance of recreational facilities for the citizens of St. Joseph, that the City is unable to accept, improve and maintain additional lands for recreational purposes, then, and only then, will the Trustees be in a position to seek relief from the rigid terms of the Bode Will. When that time comes the Trustees will act promptly."

On May 29, 1959, the Trustees acquired a tract of land for $12,000, which was transferred to the City on June 27, 1959, in accordance with the terms of the trust. However, in their second annual report, for the period ending December 31, 1959, the trustees stated:

"There is a strong possibility that the City of St. Joseph, because of the lack of adequate revenues, may find that it is impossible to improve and maintain any great amount of additional land that may be acquired with the Bode Trust Funds, and that relief from the strict provisions of the George Bode Will may be sought in the Courts."

In 1959, the trustees retained the services of the National Recreation Association to make a study of the recreational facilities and needs of St. Joseph. An exhaustive report was prepared by the association and delivered to the trustees and city and county officials in August, 1960. On October 7, 1960, at the invitation of the trustees, a meeting was held with city officials which resulted in the appointment of a committee whose members included the mayor, the president of the council, the park superintendent and the chairman of the Bode Trust

'Trustees. The committee was directed to make a thorough study of the possibility, on the part of the city, of deriving necessary funds from any lawful source that would enable it to carry out the terms of the Bode will with respect to lands conveyed to it by the Bode trustees.

The committee recommended the purchase of a 7-acre tract, which was purchased by the trustees for $23,800 and conveyed to the city under the terms of the trust. However, on February 10, 1961, the committee reported to the trustees as follows:

"It is the opinion and conclusion of this Committee that neither the City of St. Joseph, nor any of its public agencies or governmental departments, are in a financial position to improve and maintain any additional lands that may be acquired and conveyed to the City in compliance with the provisions of the Will of George Bode, Jr."

Shortly thereafter, the trustees were formally advised by St. Joseph city officials that the city could accept no additional lands on the conditions set out in the will.

The trustees, nevertheless, continued their effort to devise a program for the expenditure of the trust funds in accordance with the Bode will. Interested citizens and organizations submitted numerous proposals to the trustees, including the purchase of facilities for a museum, lake sites, the construction of theater facilities and various proposals for the purchase and development of park and recreation sites. Some proposals were rejected as impractical and some because they did not contemplate city ownership of the facility as required under the will. However, because of the city's position that it could not undertake the cost of development and maintenance of any further facilities, no further purchases were made.

The trust corpus continued to accumulate. As of March 1, 1963, the corpus stood at $3,841,418.36. The income of the trust for the year ending December 31, 1961 was approximately $142,000. The only substantial disbursement was the purchase of the 7-acre tract for $23,800.

In August, 1962, the trustees filed their petition in the Buchanan County Circuit Court. The trustees sought the court's direction on numerous questions, including their authority to acquire buildings as well as land, the extent to which they might take advantage of the city's authority to acquire land under its eminent domain power, by paying the amount of condemnation awards, the meaning of the term "public agencies" as used in the will, and whether the trustees were limited in their acquisition of recreational facilities to the specific types of recreation mentioned in the will. The court's decree with respect to such questions is not questioned on this appeal.

With respect to the issue presented, the petition alleged that the trustees had endeavored to acquire lands and convey them to the city, subject to the provisions contained in the will, but only two parcels of land had been acquired which the city would accept subject to the terms of the will, and that the city had notified the trustees that it cannot accept any additional lands under the provisions set forth in the Bode will unless and until sufficient additional revenues are received by the city that are available for such purposes.

The petition asserted that it was highly impractical for the trustees to administer the trust in a manner that complies literally and strictly with the terms of the will, and that, unless the relief sought by the trustees was granted, the only course of action available to them would be to invest and reinvest the funds in their hands until such time as the city obtains sufficient revenues to "improve and adequately maintain" the recreational facilities acquired under the will. "Such a delay is at variance with the desires of the testator, George Bode, Jr., who requested in his Will that the benefit be made available to the citizens of St. Joseph within 'the earliest practical time.' "

The petition proposed, for the consideration of the court, that the trustees' "administrative powers" be amended in two particulars:

" * * * First to the end that the funds of this Trust Estate may be disbursed in defraying the initial cost of construction, improving and equipping the facilities provided for the citizens of St. Joseph, and, second, to the end that the funds of this Trust Estate may be made available for the maintenance of such facilities as are provided by the Plaintiffs."

At the hearing, in addition to evidence pertaining to the factual matters above set forth, considerable evidence was presented relative to the city's financial situation.

The evidence showed that the City of St. Joseph presently has a park system of some 1,219 acres. Mr. Donald C. Bush of the engineering firm of Hare and Hare, which had been employed by the city to assist in city planning and which was also employed by the Bode trustees to examine the recreational facilities in St. Joseph and to advise the trustees concerning the adequacy of those facilities to meet the needs of the public, testified that the park acreage for St. Joseph was above the generally accepted standard of one acre for each 100 inhabitants, the St. Joseph ratio being one acre for each 66 inhabitants. However, a considerable portion of the St. Joseph park land is found in parkways along the city's boulevards and is not adaptable for use for recreation areas of the type called for in the Bode trust.

By the city's constitutional charter, effective November 6, 1961, the parks and recreation facilities and programs were placed under the control of the Director of the Department of Parks and Recreation. The charter authorizes the levy of an assessment at the rate of not to exceed 5 mills upon each dollar of valuation of the real estate exclusive of improvements in each of the two park districts into which the city had been divided. The proceeds of this levy were to be used for maintaining, adorning, constructing, repairing and otherwise improving parks, parkways, boulevards, roads and avenues under the management of the director. The same authority had previously been granted and exercised under Section 90.380 RSMo 1959, V.A.M.S. In the 1961–1962 fiscal year, this "mill tax" produced $124,450.78 for the operation of the park system. $5,000 was allotted to the department from the city general revenue fund. The park department collected fees of $20,494.18, making a total maintenance revenue of $149,944.-96. Total maintenance expenditures for the year were $156,138.27. For the same fiscal period, the recreation commission received $25,000 from the city's general fund and also expended some $35,000 in fees which were received in connection with the recreational services provided.

In 1951–1952, $20,867 had been allocated to the Park Board from general funds. Such allocation was $10,000 per year in the next three fiscal years, $17,250 for 1955–1956, $15,000 for 1956–1957, and $5,000 for each year thereafter until 1962–1963 when it was omitted altogether. Total park department expenditures for 1951–1952 were $132,298.00. In each of the years from 1957 through 1962, request was made for an allocation of $25,000 from general funds, but only $5,000 was provided.

For the year ending April 30, 1962, the tax, license and fee revenues of the city amounted to $3,424,100.44, the bulk of which was produced by real and personal property ad valorem taxes. Receipts from those sources amounted to some $1,-539,000, produced by a $1.15 levy for general purposes, a 45¢ levy for bond service, a 15¢ levy for garbage collection and a 5¢ levy for museum purposes. These rates were the same as in the fiscal year 1950–1951, except that in that year the rate for bond service was 50¢. By contrast, the school tax rate had increased from $1.56 in 1950–1951 to $2.72 in 1961–1962.

All of the city officials who testified, including the mayor, the director of finance

and the president of the common council, agreed that no further city general funds could be made available to the Department of Parks and Recreation in the foreseeable future. Mayor Arthur J. Meers, who had occupied that position for five years at the time of the hearing, expressed the opinion that the city's general funds had been inadequate to meet the needs of all city departments and that, should there be any substantial increase in the city's general fund, several other departments and agencies of the city, such as the street department, police and fire departments, had more pressing needs than the park department and should receive priority in allocation of any increase of the city's revenue. He foresaw no possibility in the near future that the city's general revenue would increase sufficiently to permit any substantial allocation of the city's general funds for park and recreation. He was of the opinion that any bond issue to provide for the improvement of park and recreational facilities "would fail miserably." He felt that $60,000 more annually was needed for the proper maintenance and operation of the city's existing park and recreation system.

Joseph G. Wood, City Attorney, pointed out that, under Section 94.400 RSMo 1959, V.A.M.S., St. Joseph may levy, by action of the city council, a tax of not to exceed 40¢ per $100 assessed valuation for "[l]ibrary, hospital, public health, recreation grounds, and museum purposes." At the time of the hearing, 15¢ was levied for garbage collection and 5¢ for museum purposes under this authority. The mill tax for park purposes might be levied on improvements also, not on real estate alone, by an amendment of the city charter which would require approval of a majority of the voters. This change would increase the amount produced by such tax from $126,000 to between $225,000 and $445,000 annually. A charter amendment could be initiated either by the council or by petition of electors.

Martin Thomas, Superintendent of Parks for a number of years prior to his retirement in 1962, testified that the budget of the Park Commission for the years 1958 to 1962 was inadequate to maintain the existing park system. Funds available at the time of his retirement in 1962 would have been inadequate to improve or maintain any additional lands which might be given to the city for park or recreational purposes. Mr. Bush expressed the opinion that the park department's budget at the time of the hearing was "totally inadequate" to maintain existing facilities.

The court found that "very little has been accomplished in the fulfillment of (Bode's) desire (that the facilities he sought to provide be made available to the citizens of St. Joseph within the earliest possible time), even though trust funds have been available in the hands of the Trustees for approximately five years. This is primarily due to the fact that the City has not provided funds for improvement and maintenance of such facilities. The Court finds that it is not likely that such funds will be available in the foreseeable future." The court decreed that the authority and power of the trustees should be amended to authorize the trustees, in the exercise of their judgment and discretion, to use the trust funds to pay for improvements and equipment on land now owned by the city or on land hereafter acquired by the city, whether from the trustees or other sources, when essential in the judgment of the trustees to carry out the purposes of the Bode will; to hold in reserve a portion of the corpus and to expend the income therefrom toward the maintenance of physical properties acquired by the trustees, with authority to discontinue the reserve fund when the trustees deem it no longer needed.

These portions of the decree are attacked by the Attorney General on this appeal. His position is that there was no showing in the court below that it was impossible or impracticable to carry out the express wish of the testator and that there was, there-

fore, no basis for application, which the trial court made, of the cy pres doctrine. The respondent trustees answer that they did not seek the application of the cy pres doctrine, but merely asked for the court's permission to deviate from some details prescribed by the will in their administration of the trust, and that the trial court's decree was proper under the circumstances of this case.

There is a recognized distinction between application of the cy pres doctrine and the exercise by a court of equity of its jurisdiction to alter or amend administrative details in the performance of a charitable trust. In 2 Restatement of Trusts 2d, Sec. 381, page 273, we find the following:

"The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.

\* \* \* \* \* \*

"The rule stated in this Section has to do with the powers and duties of the trustees of charitable trusts with respect to the administration of the trust; it has to do with the methods of accomplishing the purposes of the trust. The question of the extent to which the court will permit or direct the trustee to apply the trust property to charitable purposes other than the particular charitable purpose designated by the settlor where it is or becomes impossible or illegal or impracticable to carry out the particular purpose involves the doctrine of cy pres, which is dealt with in Section 399."

Bogert states (The Law of Trusts and Trustees, 2d edition, Sec. 394, page 236):

"The cy pres power is discussed in a later chapter. Under it where the charitable trust purpose has become impossible or impracticable of accomplishment the court may alter the objective of the trust by substituting another trust purpose which it deems to be as nearly as possible like that of the settlor. This is remodelling the trust by changing the purpose which the trustor had chosen as a means of bringing about public benefit. It is not merely changing machinery of administration, that is, the ways which the settlor had prescribed for the conduct of the work of the trustee.

"The court possesses a second important power, namely, that of changing, or permitting the trustee to change, the methods of administration set forth in the trust instrument, when this is deemed necessary or highly desirable in order to enable the trustee to perform the trust. This is called the power of the court to sanction deviation from the terms of the trust. The difference between this power and the cy pres power is not always observed by the courts. Sometimes an order which merely relieves the trustee of a handicapping limitation found in the trust instrument or merely permits the trustee to use funds to forward the original purposes of the trust in new ways, is called the use of cy pres; whereas in reality it is a departure from the prescribed methods of operation without in any way varying the end results which the donor envisaged. While the effects of using these two powers are similar, the procedure, formalities, and evidence required for the use of one power may be different from the requirements applying to the use of the other power."

The distinction is recognized in a number of Missouri cases, including Lackland v. Walker, 151 Mo. 210, 52 S.W. 414; Women's Christian Association v. Kansas City et al., 147 Mo. 103, 48 S.W. 960; Taylor v. Baldwin, 362 Mo. 1224, 247 S.W.2d 741.

Whether the question be one of deviation from administration terms or application of the cy pres doctrine, the question essentially presented is whether or not circumstances not foreseen by the testator

have arisen which threaten the fulfillment of the charity and whether or not such circumstances warrant a court of equity's exercise of its jurisdiction to enforce and protect charitable trusts. Whether the relief requested be a change in the purpose of the trust to one as near as possible to that fixed by the testator or a deviation from an administrative detail in the carrying out of the charity, the terms of the trust instrument should not lightly and casually be disregarded. However, the accomplishment of the ultimate purpose of the testator is the matter of paramount importance and its achievement must be the object of any judicial permission to alter or deviate from the trust terms.

In this case, we have in the record little of the personal history of George Bode. We do know that he was a former resident of St. Joseph although he was living in St. Louis at the time of the execution of his will in 1945 and in St. Louis County at the time of his death in 1955. We know that at the time of his death he owned real property located in St. Joseph. Otherwise we have no information as to the extent of his connection with the city of his birth. However, George Bode's will clearly indicates that he had a warm spot in his heart for St. Joseph. By his codicil to his will, he directed that his ashes be interred "in the family burial lot in the grave provided for me at Mount Mora Cemetery, St. Joseph, Missouri." He left practically his entire estate in trust with the "desire that the trust estate be utilized to confer the widest possible benefits among all the citizens of St. Joseph." He expressly directed the trustees of the trust which he established "to bear in mind my desire that the benefits herein contemplated be made available to the citizens of St. Joseph within the earliest practical time." He did not name the trustees himself, directing only that they be "five in number, * * * selected from public spirited, patriotic citizens of St. Joseph * * *." He entrusted their selection to public officials of that city and of Buchanan County. His interest in the citizens of St. Joseph and his confidence in the public officials of the city and county are obvious.

He sought to benefit the citizens of St. Joseph by providing land on which would be established "public parks, playgrounds, athletic fields, including baseball diamonds and grounds, tennis courts, and a zoological garden, if financially possible, all for the use and benefit of the citizens of St. Joseph," with the property and facilities to "at all times be equally open and available to all citizens of St. Joseph, without regard to creed or denomination." In his design for carrying out his desires, Mr. Bode laid down a program which anticipated the cooperation of the city by having that governmental body develop and maintain the facilities on the land which the trustees would purchase for such purpose. Whether this provision expressed Bode's basic concept of charity that the donee or beneficiary should himself contribute something to the fulfillment of the benefits to be conferred upon him, or whether there were other considerations which caused the provision to be inserted, such as the possibility that Bode felt at the time that he made his will his estate would be sufficient only to purchase land and would not be adequate to assist also in its development and maintenance (his suggestion for a zoological garden was conditional upon its "financial" possibility), we cannot now determine. However, in view of his definitely expressed interest in benefiting the citizens of St. Joseph, we cannot believe that Bode would have such benefits withheld because of the city government's financial situation when the trust was in a position to provide them fully.

Taking into consideration that any possible interest on the part of the heirs of Bode has been terminated (Peters and Thiehoff not having appealed from the trial court's decree to such effect) and that there is no provision for a gift over in the event of failure of his design to benefit the citizens of St. Joseph, we feel that the trial court properly concluded that the limitation that the trust funds be used only for the

purchase of real estate, to be developed and maintained by the city, should be subordinated to the accomplishment of Bode's primary object of benefit to the citizens of St. Joseph.

We believe that there was a sufficient demonstration of the impossibility "(in a legal sense)" (Lackland v. Walker, 151 Mo. 210, 243, 52 S.W. 414) of carrying out the trust strictly in accordance with its terms and conditions. True, as the Attorney General argues, there are sources of revenue to which the City of St. Joseph might resort in order to provide funds for the improvement and maintenance of the land which the trustees might purchase. The council might levy the remaining 20¢ of the tax authorized for "library, hospital, public health, recreation grounds and museum purposes," (assuming that "recreation grounds" would be broad enough to authorize the levy for such purpose). The charter might be amended to levy the mill tax for park purposes on improvements, not the realty alone. Potentially, the additional 15¢ levy above the $1.00 could be increased by authorization of ⅔ of the electors. A bond issue, upon approval of ⅔ of the electors, would be legally possible in order to provide funds for improvement of sites purchased. Recent experience gives no basis for optimism that any proposal requiring electors' approval would succeed, particularly if the proposal would require approval of ⅔ of the electors. A proposed library tax was rejected and a bond issue for a sewage disposal system was rejected repeatedly, despite the threat of federal sanction to prevent further pollution of the Missouri River. The proposal was finally approved, but the difficulty which it encountered indicates rather strong voter resistance to increasing the municipal bonded indebtedness.

Furthermore, bond issue funds would be available only to improve facilities, not to maintain them.

St. Joseph unquestionably finds itself in financial straits. We well know that the demands on municipal budgets have increased steadily in recent years. We find no occasion to question the good faith of the city officials who accorded higher priority to the demands of other municipal departments and agencies than to those of the Department of Parks and Recreation. Certainly the testimony of Mr. Thomas, the retired Superintendent of Parks, and of Mr. Bush, that maintenance of existing park facilities is inadequate, corroborate Mayor Meers' statement that around $60,000 per year additional is needed for the proper maintenance of existing park facilities.

We believe that the city officials have conscientiously considered the city's practical ability to undertake the cost of the development and maintenance of additional recreational facilities for which the trustees might purchase land and have honestly concluded that the city's finances would not support such a burden. Certainly, in this context, the "impossibility" which justifies equitable relief from the terms of the trust restriction does not require a showing that all sources of revenue legally available to the city have been exhausted and that there is no possible method of acquiring additional revenue. Even if all taxes were levied at the maximum rate, there would remain the question of judgment as to where the money should be applied, a matter which the municipal authorities must determine.

We feel that the evidence has adequately shown a basic impracticability at the time of accomplishing the testator's fundamental purpose by strict adherence to the details of the methods which he proposed. We see nothing to be gained by waiting four or five years longer to see whether or not the city's financial situation will improve. Mr. Bode's wish was that the benefits be conferred upon the citizens of St. Joseph as soon as practical. Further delay might serve only to intensify the city's predicament by providing the trustees with increased funds to purchase land for the city to improve and maintain. Nor would we see any advantage in an ultimatum to the city either to comply with the terms of the trust or surrender its benefits. Mr. Bush stated that

he did not see how the entire trust estate could be spent "wisely on land acquisition." He expressed the opinion that an expenditure of $650,000 for land would put the city "in marvelous shape as far as park ownership is concerned." An expenditure of this size would leave the trust corpus as received by the trustees practically intact. In such circumstances, having attained the essential purpose of Bode, the trustees would be obligated to obtain direction as to the expenditure of the annual income accruing to the trust. Certainly no better use could be made of it to accomplish Bode's purpose than to use that income for development and maintenance of the tracts purchased with the trust funds. Such is the practical effect of the court's decree and we will not order otherwise.

Essentially, the problem presented in any case of this nature is a factual one. Each case must be decided on the basis of its particular facts. We will not endeavor to analyze at length the cases relied upon by appellant. However, we consider none of them wholly analogous to the situation here presented and do not find that refusal of the requested relief in cases such as St. Louis v. McAllister, 281 Mo. 26, 218 S.W. 312, and Board of Trustees of Hannibal Presbytery, etc. v. Taylor, 359 Mo. 417, 221 S.W.2d 964, affords a sound basis for the refusal of the relief sought in this case.

On the other hand, the basic reasoning of the trial court in decreeing that the trustees should be allowed to deviate from the concise terms of the trust in order to effectuate its ultimate purpose appears to us to have been wholly consistent with the decision in Lackland v. Walker and Women's Christian Association v. Kansas City, supra. We consider the remarks of Professor Scott particularly pertinent to this case. IV Scott on Trusts, 2d Ed., Sec. 399.4, page 2853.

"It is believed that the courts have not infrequently been too reluctant to permit a deviation from the directions of the testator. The result of a too strict adherence to the words of the testator often means the defeat rather than the accomplishment of his ulti-mate purpose. He intends to make the property useful to mankind, and to render it useless is to defeat his intention. 'Under the guise of fulfilling a bequest,' said John Stuart Mill, 'this is making a dead man's intentions for a single day a rule for subsequent centuries, when we know not whether he himself would have made it a rule even for the morrow.' "

## ATTORNEYS' FEES

Mr. Bode's sole heir at law was his sister, Meta Bode Long. Mrs. Long died, leaving as her heirs, two daughters, Mildred L. Peters and Eleanor L. Thiehoff. Mrs. Peters and Mrs. Thiehoff were parties to proceedings to establish an allegedly lost will, dated July 24, 1948, as the last will of Bode. The probate court of St. Louis County rejected the alleged will. The St. Louis County Circuit Court dismissed the action in that court. Pending an appeal to the Missouri Supreme Court by the claimants, an agreement was entered into between the claimants, including Mrs. Peters and Mrs. Thiehoff, and the Bode trustees, under which the claimants transferred to the trustees all of their claims and "all of their right, title and interest, if there be any, in and to the property and estate of George Bode, Jr., deceased, whether arising as legatee or devisee under any alleged will of George Bode, Jr., or as an heir, servant, employee or otherwise." The trustees agreed to pay the claimants $50,000. The Circuit Court of St. Louis County approved the settlement and the claimants were paid $50,000 by the trustees and the judgment dismissing their action in the St. Louis County Circuit Court became final.

After the original petition in this case had been filed, a motion to intervene was filed on behalf of Mildred L. Peters. By her motion she alleged she was a necessary party defendant in the action under Civil Rule 52.11(a) (2 and 3), V.A.M.R., as an heir at law of George Bode, Jr. She alleged that the trustees by filing their action had opened the entire trust to examination by the court and that, if the court

failed to grant the relief sought by the trustees and there was a failure to show that the trust could be enforced in its present form, the court would find a resulting trust in which the intervenor had a 50% interest as the niece and heir at law of Bode. By her proposed answer tendered with her motion to intervene, Mrs. Peters sought judgment that the Bode trust had failed, that the cy pres doctrine was not applicable and that a resulting trust arose in favor of Bode's heirs at law.

Prior to any action by the court on the motion to intervene, the trustees filed their amended petition wherein Mrs. Peters and Mrs. Thiehoff were named parties defendant. The first amended petition alleged that Mrs. Peters and Mrs. Thiehoff were made parties to the cause because Mrs. Peters had heretofore filed her motion to intervene. The amended petition also alleged that Mrs. Thiehoff claimed an interest in the assets of the trust estate. The petition further alleged that the claims of interest on the part of Mrs. Peters and Mrs. Thiehoff were without foundation, "but having been made constitute a cloud upon the title to the assets received by the Plaintiffs herein." The petition further alleged that neither Mrs. Peters nor Mrs. Thiehoff were necessary parties to the action; that they were made parties defendant in order to dispose of any claim which either might assert and thus avoid a multiplicity of suits. Both Mrs. Peters and Mrs. Thiehoff filed separate answers, each of which sought a decree that the trust had failed, that the doctrine of cy pres is not applicable and that another resulting trust in favor of the heirs at law of Bode came into existence. Each answer also asked for attorney fees for each of the defendants. The plaintiffs filed replies to the answers of Mrs. Peters and Mrs. Thiehoff. By the replies plaintiffs set up the aforementioned settlement agreement by which Mrs. Peters and Mrs. Thiehoff assigned to the trustees all of their claims to the estate of Mr. Bode. The plaintiffs allege that by virtue of the settlement agreement Mrs. Peters and Mrs. Thie-

hoff had no interest and no claim of right to any of the property of the Bode estate.

On the trial, Mrs. Peters and Mrs. Thiehoff were represented by counsel who participated in the examination of the witnesses produced by the plaintiffs. The general tenor of such examination was designed to establish the failure of the Bode trust.

Prior to the court's entry of its final decree, a hearing was held with respect to the requests for attorney fees by Mrs. Peters and Mrs. Thiehoff. Evidence was presented regarding the services which had been rendered and practicing attorneys testified that, in their opinion, reasonable value of the services for Mrs. Peters' attorneys amounted to between $12,000 and $15,000 and for Mrs. Thiehoff's $8,000.00. The court by its decree found that the trust was benefited by having the defendants Mrs. Peters and Mrs. Thiehoff as parties to the litigation "by reason of the fact that the Court has fully and finally ruled that they have no interest whatsoever in the trust assets." The court allowed Mrs. Peters $12,000 for her attorneys and for Mrs. Thiehoff's attorney an $8,000 fee.

On this appeal, the Attorney General contends that the court erred in allowing any attorney fees to Mrs. Peters and Mrs. Thiehoff because their interest in the litigation was to destroy the trust. The Attorney General further urges that, in the event attorney fees should be allowed to these parties, the amount allowed is excessive. The trustees did not appeal from that portion of the decree allowing attorney fees. In their brief in this court they state that they concur in the position of the Attorney General.

■ The trustees' petition alleged matters which, in the absence of a finding of a general charitable intent on the part of the testator, might have called for the conclusion that the trust had failed. Therefore, the trustees were interested in establishing such general charitable intent and

the trial court found that Mr. Bode's will evidenced such an intent. A proper and binding adjudication to such effect required the participation in the litigation of persons entitled to assert the contrary of the position. The Attorney General, as the defender of charitable trusts, was in no position to do so. Nor was the city, as representative of the beneficiaries of the trust. The only persons in such position were those entitled to share in the trust assets upon failure of the trust, the heirs of the testator, whose rights arise because they stand in the testator's shoes. 15 Am.Jur. 2d, Charities, Sec. 128, page 135.

In such situation, the heirs are necessary parties to the trustees' action for construction of the trust and are entitled to the allowance of their attorneys' fees from the trust estate. City of St. Louis v. McAllister, 302 Mo. 152, 257 S.W. 425, 427; Lang v. Taussig, Mo.App., 194 S.W.2d 743, 748(2–7). Cases relied upon by the Attorney General, such as Thomson v. Union National Bank, Mo.Sup., 291 S.W.2d 178; Creek v. Union National Bank in Kansas City, Mo.Sup., 266 S.W.2d 737; Clark v. Mississippi Valley Trust Co., 357 Mo. 785, 211 S.W.2d 10; Garrison v. Garrison, 354 Mo. 62, 188 S.W.2d 644; Marr v. Marr, 342 Mo. 656, 117 S.W.2d 230, and Chapman v. Chapman, 336 Mo. 98, 77 S.W. 2d 87, involving the right of a person bringing an action to destroy a trust to the allowance of attorneys' fees from the trust estate, are not controlling in this situation— an action brought by the trustees for a proper construction of the trust instrument. Nor do we consider, as the Attorney General suggests, that City of St. Louis v. McAllister, supra, has been overruled by more recent cases, beginning with Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104. Trautz v. Lemp involved an ab initio attack upon the validity of a trust as violative of the rule against perpetuities. In McAllister, as the court pointed out, the heirs did not attack "(t)he validity of the devise under

the Mullanphy will as a gift to charity * * *." 257 S.W., 1. c. 427. This distinction was noted in Trautz v. Lemp, 72 S.W. 2d, 1. c. 108. The same distinction here exists and the rule of McAllister applies.

The settlement agreement in the proceedings involving the allegedly lost will did not on its face expressly preclude any interest on the part of Mrs. Peters and Mrs. Thiehoff should a resulting trust have been found to have arisen. A plausible argument was advanced that it did not have such effect. Therefore, we do not consider that the possibility of their sharing in the benefits of a resulting trust was so remote as to permit us to say that there was no "legitimate controversy" (Hereford v. Unknown Heirs, Mo.App., 306 S.W.2d 648, 650) as to the rights and interests of Mrs. Peters and Mrs. Thiehoff.

■ The Attorney General also questions the amount of the fees awarded. The only evidence on this subject was on behalf of the attorneys for the claimants. The attorneys themselves testified as to the work which they did and eminent members of the bar placed a value upon such services of between $12,000 and $15,000 for counsel for Mrs. Peters and of $8,000 for counsel for Mrs. Thiehoff. No other evidence was offered on the issue. In such circumstances, we find no such abuse of the discretion accorded the trial court as would justify our reducing the amount awarded. Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104, 110 (11).

The judgment is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.