The RANKEN–JORDAN HOME FOR CON-
VALESCENT CRIPPLED CHIL-
DREN, Plaintiff-Respondent,

v.

DRURY COLLEGE, an Educational Corpora-
tion, Defendant-Appellant.

Mercantile Trust Company National Associa-
tion, as Sole Trustee Under the Mary A. L.
Ranken Jordan Inter Vivos Trust and Un-
der the Ettie Amelia Jordan Inter Vivos
Trust, and as Co-Trustee Under the Will
of Lewis Wilkins Hyer, Deceased; Robert
M. Good, President of the Board of Trus-
tees of The School of the Ozarks, as Co-
Trustee Under the Will of Lewis Wilkins
Hyer, Deceased; M. Graham Clark, Presi-
dent of The School of the Ozarks, as Co-
Trustee Under the Will of Lewis Wilkins
Hyer, Deceased; and Norman H. Ander-
son, Attorney General of the State of Mis-
souri, Defendants-Respondents.

No. 54346.

Supreme Court of Missouri,
Division No. 1.

Jan. 12, 1970.

162

John H. Lashly, Paul B. Rava, Lashly, Caruthers, Rava, Hyndman & Rutherford, St. Louis, Mo., for plaintiff-respondent.

Farrington, Curtis & Strong, Jack S. Curtis, Springfield, Mo., for defendant-appellant, Drury College.

Thompson, Mitchell, Douglas, Neill & Guerri, Richard W. Metz, St. Louis, Mo., for defendants-respondents trustees.

HOUSER, Commissioner.

Declaratory judgment action by The Ranken-Jordan Home for Convalescent Crippled Children, a nonprofit pro forma decree charitable corporation, seeking a judicial construction of the terms of three trust indentures naming The Home as beneficiary and judicial approval of a plan for broadening the scope of its activities. The named defendants are the trustees of the three trusts, the Attorney General and Drury College, an alternate or contingent beneficiary in one of the trust instruments. Drury filed an answer, counterclaim and cross bill. The court found the issues on the petition for The Home generally and dismissed Drury's counterclaim and cross-claim. From this judgment Drury has appealed.

The objects and purposes of The Home as declared in the articles of agreement under which it was incorporated in April, 1940 were "to operate as a non-profit association for the housing, support, care and treatment of crippled children during the convalescent period after active hospitalization has terminated" (regardless of payment for the services) and as a secondary and subordinate object and purpose to furnish these facilities for crippled children who have not had the benefit of hospitalization.

The founder of The Home, Mary A. L. Ranken Jordan, created a trust estate for its support in April, 1940. In June, 1952 Miss Ettie Amelia Jordan created a trust estate naming The Home as a beneficiary. Their friend and fellow philanthropist

Lewis Wilkins Hyer created a trust estate for its benefit by codicil to his will in August, 1952 containing this provision:

"'D' Five percent (5%) of the net income to The Ranken-Jordan Home for Convalescent Crippled Children located on Ladue Road in St. Louis County, Missouri, for the general purposes of the Home.

"If for any reason the name of the institution is changed or if there is a change in the purposes for which the institution is presently operated or if the operation of the institution is transferred to or taken over by some other organization, then said five percent (5%) of the net income and revenue shall thereafter be paid to Drury College at Springfield, Missouri, for the general purposes of the College."

The Home, housed in a 3-story building on 4 acres of ground on Ladue Road in St. Louis County, has been operated since 1940 for the purposes declared in its articles of agreement. Income always exceeded outgo. During each year of its existence its supporting trusts and other sources yielded a surplus of income in excess of expenses ranging from a low of $1,423 in 1944 to $75,052 in 1964. At trial time accumulated surpluses in various accounts exceeded $1,500,000. This occurred in spite of increasing costs of operation and the expansion and upgrading of personnel, services and facilities. Through the years The Home experienced difficulty in maintaining full occupancy of its in-patient facilities. The low point was reached in 1963 when the number of patient hospital days. was about half that of 1953. Elimination of certain crippling diseases such as polio (down from 14 patients in 1952 to 1 in 1958 and none thereafter) and reduced frequency of other crippling diseases such as rheumatic fever (down from 38 patients in 1958 to 3 in 1966) were primarily responsible for the availability of extra space in The Home. These changes resulted from the achievements of medical research which provided new methods of highly ef-

fective treatment and care. Determined "to explore new avenues whereby part of the funds on hand, after providing an adequate reserve, could be used to improve the operation of the Home and provide better service to crippled children in line with modern concepts of care and treatment," the trustees, after investigation and consideration of various possibilities (such as establishing a unit for treatment of burns, a psychiatric unit, a unit for the treatment of mental retardation, etc.) determined upon a plan whereby The Home, Washington University and its Medical School and St. Louis Children's Hospital, would affiliate and a new "Ranken-Jordan Center for Crippling Diseases of Children" be established, maintained and operated in St. Louis Children's Hospital "for broad research, service, and treatment in the general area of crippling diseases of children which, at the inception, will be primarily concerned with inherited diseases in children, including the inborn errors of metabolism." The Center would be established on two floors of unfinished space in the Hospital's new addition, with laboratories, treatment rooms, and research space, using the most modern equipment. The Home would pay the cost of construction of such facilities to a maximum of $500,000. The facilities and equipment would be the property of the Hospital, but would be leased to The Home for a rental of $1 per year. The facilities would be staffed by basic and clinical scientists and ancillary ·workers, including technicians and other personnel, to be chosen and employed by the University's School of Medicine and paid under an agreement between the Hospital and University. The Hospital would furnish all necessary facilities for out-patient evaluation and care. The University's Clinical Research Center of the Hospital would provide space for carrying out necessary clinical studies. Any children afflicted by a crippling disease .or condition, including particularly inborn errors of metabolism or other genetic or metabolic diseases, who in the opinion of the Center staff need treatment and care in a hospital, would be pro-

vided such treatment, care, housing and support at the Hospital. Subject to space availability The Home would house, support, care for and provide treatment at its present facilities on Ladue Road for children with inborn errors of metabolism or other genetic or metabolic diseases who are selected by the Hospital staff as in need of such care and treatment outside their own homes but not in a hospital, whether or not they have been in a hospital prior to such selection. The Home would furnish transportation for such children to and from the Hospital as needed for special treatment or study, and the physicians from the University's School of Medicine and Hospital would provide continuing consultation, care and treatment, whether the children were in the Hospital or The Home. The Home would contribute a minimum sum of $50,-000 annually toward expenses of maintenance and operation of the Center for 10 years, but in view of its primary obligation to maintain and operate its present facilities The Home could reduce or eliminate its annual contribution if in any year the income of The Home from all sources (including the three trusts) should be less than the cost of maintaining and operating its present facilities. The remaining expenses would be paid by the University and Hospital and through government and private agency grants. The Center would be staffed by the leading pediatricians from the University's Department of Pediatrics and from the Hospital and would develop a teaching staff "which will spread widely the results of the research and treatment accomplished at the Center." The Home would have the right to recommend patients and the operational practices of the Center would be subject to the approval of The Home. The Center would furnish The Home a full and detailed yearly report of all aspects of the Center's activities. The several institutions would work together in close cooperation and the trustees of The Home would be consulted and advised from time to time.

The benefits to be derived both by The Home and its patients, as well as by crippled children generally, were described by the uncontradicted testimony of a distinguished group of medical experts, including pediatricians, orthopedists, the Director of Health and Hospitals of the City of St. Louis, and faculty members of two medical schools. Their testimony noted a great change in the orientation of medical care and facilities leading to a close integration of treatment and research ("they go hand in hand"), which seeks out the causes of disease and provides new means and techniques for treatment and care of patients at the hospital and at the convalescent home. They testified that to enhance availability of top personnel and of the required highly specialized facilities and costly equipment, affiliation of a small unit such as The Home with a large medical center connected with a medical school of the caliber of Washington University is highly desirable and beneficial to patients; that comparable homes in other parts of the country which have failed to thus affiliate have closed down; that under the plan of affiliation The Home will be able to continue to fulfill its purposes on an upgraded level of performance; that it will receive more patients and will be able to attract highly qualified and specialized medical personnel and that better care and treatment are expected.

The affiliation agreement, reduced to writing, was not approved when presented to the trustees of The Home, on the ground that it appeared to deviate from the specific terms of the governing trust instrument. When The Home brought this action the trustees demanded strict proof. After the trial the trustees were persuaded that The Home had carried its burden of proving that the plan did not represent any departure from the proper purposes of The Home under the three trust instruments, but they suggested to the trial court that it would be appropriate to confine the funding of the plan to the Jordan trusts, since it appeared that funds deriving from the Hyer trust would not be needed and particularly in view of Drury College's strenuous

objections. The court adopted this suggestion.

Drury's answer alleged that the proposed plan constitutes a departure from the purpose for which The Home was organized and has been operating; that under the plan The Home would become secondary and the Center primary; that the Center would be operated under the supervision and authority of others than the trustees of The Home; that no authority exists in any of the three trust instruments to spend funds for the purposes set forth in the agreement; that consummation of the plan would constitute a change in the purposes for which The Home was operated at the time of the execution of Mr. Hyer's codicil (1952); that the Hyer trust has failed because The Home has failed to use the funds derived therefrom, and has no need for such funds to accomplish its purposes, and that such surplus funds should be paid to Drury. On this basis Drury in its counterclaim and cross-claim prayed for judgment against The Home and an order to pay to Drury that portion of its accumulated surplus derived from the Hyer trust, and to pay to Drury in the future any portion of the income from the Hyer trust not needed for carrying out the purposes of The Home as it was operated on August 18, 1952.

Abandoning its pretrial theory that Drury is entitled to ALL of the surplus funds deriving from the Hyer trust since Mr. Hyer's death on February 26, 1957, Drury on this appeal demands a pro rata or percentage share of the surplus funds now on hand and hereafter to accrue, after paying all expenses of operation of The Home, in the proportion that the contribution to The Home from the Hyer trust bears to total income of The Home. Drury's claim, based on percentages of total annual income during the years 1957–1968 varying from approximately 19% to 34%, totals $166,856.

Both parties agree that the income from the Hyer trust must be distributed in accordance with the intention of the testator. Drury's position is that Mr. Hyer intended that the funds from his trust be used to carry on the operations of The Home in the same manner as they were being conducted at the time he executed his codicil on August 18, 1952, or in the alternative that they be paid to Drury; that the purposes and functions of the proposed Center are vastly different and constitute a complete departure from those which have been and are being performed by The Home; and that Mr. Hyer intended that any part of the funds from his trust not used in the operation of The Home be made available to Drury. Drury claims that any use of The Home's funds under the affiliation agreement would have to be under the cy pres doctrine, because it has become impossible or impractical to use all of its funds in the present operation, but that the cy pres rule cannot be applied under Curators of Univ. of Missouri v. Univ. of Kansas City, Mo.Sup., 442 S.W.2d 66, 72, because of the gift-over provision in the codicil. Drury excepts to the judgment authorizing the expenditure of funds from the other two trusts for the purpose of establishing the Center, which in effect authorizes and directs the use and exhaustion of the funds deriving from the Hyer trust for the payment of ordinary operating expenses of The Home, on the ground that all funds received by The Home from the several donors must be expended for operational expenses on a pro rata basis; that funds from the Hyer trust cannot be used for such purposes out of such proportion, in order to enable the funds from the other two trusts to be used for other purposes.

Drury's position is based upon a number of propositions which have not been established in law or in fact: that the purposes for which the institution was operated in 1952 would not include the purposes for which the Center is proposed to be operated; that the failure to use all of the income and the building up of a surplus of funds constitutes a failure of the trust; that the accumulation of unexpended sur-

plus funds in the hands of The Home activates or triggers the gift-over provision not only as to funds accumulating in the future, but also as to funds which have accumulated in the past; and that the funds received from multiple donors must be expended for operational purposes on a pro rata basis.

▆▆▆ As pointed out in Taylor v. Baldwin, 362 Mo. 1224, 247 S.W.2d 741, those charged with the responsibility of operating and governing a public charity must operate it for the charitable purposes intended, but in the absence of charter limitations may exercise a discretion as to the manner and means by which its purposes are to be accomplished. While that discretion is subject to examination by a court of equity, and an abuse of that discretion may be restrained, the courts will not interfere with a fair and reasonable exercise of the discretion of the board of trustees unless there is such a substantial departure from the dominant purpose of the charity as to amount to a perversion.

The trial court made these findings, among others:

"The action of the Board of the plaintiff carries out and implements the ultimate object and the dominant purposes of the three trusts, namely, the treatment and care of crippled children, whose best interests must be of paramount consideration. Their optimum treatment was the dominant goal of the grantors, not any operational avenue to achieve it. The Home has never been static in its operation, but it has endeavored over the years to treat and care for new types of diseases and improve its services. The affiliation involved here merely reflects the modern trend in the field of public health and medical orientation, and a court of equity has the power to mold the form of a charitable gift or devise to suit the necessities of changed conditions, which the grantors could not foresee when their gifts were made. The Court agrees that the dominant purposes

of the grantors will most effectually be accomplished by carrying out the program which the Home has adopted, and accepts the testimony of the many distinguished medical experts and their opinion that the best way to aid crippled children is to find the root of their condition and then to find a cure."

▆▆▆ There is ample evidence to sustain and we uphold the findings of the trial court on this phase of the case. It is true that the evidence shows that no hospital-type services are now provided at The Home; that no research facilities, basic or applied, or laboratory facilities are maintained; that no contribution of its funds has heretofore been made to any other organization; and that activities will be carried on at the Center involving an expansion of the functional methods of operation and activities of The Home. The proposed changes and differences, however, are changes and differences in the modus operandi—in technique—in the means of accomplishing the objects and purposes expressed in the articles of agreement—and do not constitute a departure, deviation from or a perversion of the objects and purposes of The Home as therein stated. Prohibited is a change of purpose, not a change of the means of accomplishing that purpose. The means of accomplishing the stated purposes were not delineated in the codicil. Mr. Hyer did not require that the purposes be served only by conducting the operation in the 3-story building on Ladue Road, nor in any specified way, nor did he prohibit the extension of The Home's services through such an arrangement as that incorporated in the affiliation agreement. While he decreed that there be no change in the *purpose* for which the institution was then being operated he did not in terms or by implication require that it be operated in exactly the same *manner*, nor did he lay down any strictures which would prevent the board of trustees "from accommodating its administration of this charity to changed conditions as the decades come and go, *so long as the Board*

*continues to operate it for the dominant object and purpose stated in its charter."* Taylor v. Baldwin, supra, 247 S.W.2d 1. c. 756. Although the plan of affiliation constitutes a change in the methods of accomplishing the purposes of the trust; envisages a different method of administration, and "forward[s] the original purposes of the trust in new ways," a court of equity has the power to permit the trustees of a trust thus to depart from previously employed methods of operation, where the dominant purpose of the trust and the end result envisioned by the donor is not varied. Reed v. Eagleton, Mo.Sup., 384 S.W. 2d 578, 585; Lackland v. Walker, 151 Mo. 210, 52 S.W. 414; Women's Christian Ass'n v. Campbell, 147 Mo. 103, 48 S.W. 960; Taylor v. Baldwin, supra; First National Bank of Kansas City v. Stevenson, Mo.Sup., 293 S.W.2d 362; Restatement of the Law, 2d Trusts, § 381; Bogert, Trusts and Trustees, 2d Ed., § 394, p. 236.

■ The objects and purposes of the institution have always been and under the proposed plan will continue to be to house, support, care for and treat crippled children. While "crippling' was originally considered to be primarily an orthopedic or joint handicap, such as club feet, twisted limbs or bones, curvature of the spine, loss or shortening of a leg or arm, etc., the evidence is that this concept has changed in the past thirty years. Today "crippling" is any condition, whether it be orthopedic, medical, physical or mental, that causes a handicap in a child and limits his full participation in the activities of society, including the treatment of genetic or inherited disorders and disabilities, and this is the view that the administrators and physicians serving The Home have entertained. The Home has always cared for children other than those with strictly orthopedic problems, such as rheumatic fever, tumors, malnutrition, etc. All of these conditions are crippling. The Home has regularly expanded the scope of its operations and functions as the need arose for the care of various disorders and disabilities, and has

adapted to medical advances which have witnessed the elimination or reduction of certain types of diseases and an increase in the incidence of others. These changes in methods and modes of care and treatment, and changes in the types of patients admitted over the years, which began and were in progress during the time the Jordan ladies were active in the management of the affairs of The Home, were characteristic of The Home prior to the execution of the Hyer codicil. Under the evidence it appears that research and care are interrelated; that they are two facets of the same activity; that both have the same purpose, which is the treatment of the patient; that you cannot have optimal care without contemporaneous investigation. To attempt to set up adequate research facilities at The Home and provide its own staff of specialized personnel in an isolated, small center would be prohibitively expensive, impractical and indeed impossible. So the modern trend has been toward affiliation of small institutions with large medical complexes which have available the necessary specialized facilities of equipment and personnel. The affiliation of The Home with the Center will better enable The Home to obtain the results of various kinds of tests and analyses (such as blood, urine and throat culture samplings) which through the years have been done on a limited scale by the laboratories at St. Louis Children's Hospital. It will extend, amplify and intensify the program of attendance on the patients at The Home by the Medical School faculty members, a program which has been in operation since the middle forties. There is in the proposed plan no radical departure from the past under the concept of The Home as merely "convalescent" in scope and program. Through the years there has been a certain amount of care, treatment and therapy at The Home beyond the strict definition of "convalescence," and some therapy now available at The Home was not available 25 years ago. Habitually in the past the children have been transferred from The Home to the Hospital and vice versa for the use of the

facilities and personnel best adapted to their specific needs. Thus in many respects no departure in the means of accomplishing the purposes and objectives is proposed, but only an intensification and augmentation of a program already in effect. Under the plan treatment and care techniques will be improved; research facilities will be opened up on a scale never before possible to The Home or the Hospital; the standards and qualifications of the medical and auxiliary personnel will be upgraded whereby the free services of highly specialized and qualified personnel will be made available to the children at The Home, and it will open up a new and important source of additional patients to fill its unoccupied beds and better fulfill its ultimate goals.

We conclude that the affiliation agreement does not represent a perversion, departure or deviation from the dominant objects and purposes of the charity or of the trust created by the codicil to the will of Mr. Hyer, and therefore there was no "change in the purposes for which the institution is presently operated" within the meaning of the provision of the codicil diverting these funds to Drury in that event.

■■■ With respect to the other propositions upon which Drury's position rests: The accumulation of a surplus of income over outgo did not constitute a failure of the trust nor is it one of the contingencies which under the codicil activates or "triggers" the gift-over provision in favor of Drury, either from a consideration of the language of the codicil or the circumstances existing at the time the codicil was executed. In his codicil Mr. Hyer provided for Drury in three specific eventualities: upon change of the name of the institution; a change in the purposes for which the institution was being operated, and transfer to or take-over of the institution by some other organization. The accumulation of a surplus is not mentioned as a condition upon which the gift-over to Drury should occur. The testator did not provide that the trust should fail or that the gift-over to Drury should become effective upon the accumulation of a surplus or failure on the part of The Home to use all of the proceeds of the gift in its operation. Furthermore, when Mr. Hyer executed the codicil the articles of agreement of The Home contained a provision authorizing the board of directors to invest and reinvest "any of its funds not currently required for the aforesaid objects and purposes in interest bearing [and dividend paying securities]." For years prior to the execution of the codicil the board of directors had followed a policy of investing its surplus funds in common stocks. An unconditional gift to a charity organized and operating under such a provision indicates an acceptance by the donor of the accumulation of surplus funds as a "way of life" in the operation of the institution. The circumstances existing in August, 1952 when the codicil was executed, including the past experience and financial history of The Home, make it plainly evident that the accumulation of a surplus might well have been anticipated. In each of the eleven years preceding the execution of the codicil The Home had enjoyed a surplus of income over outgo, ranging from $1,423 in 1944 to $22,585 in 1950. During the period 1949, 1950 and 1951 the annual surpluses had averaged more than $19,000. Mr. Hyer must have known that the addition to the income of The Home of 5% of the net income of his trust would increase the annual surplus. That is what happened. Between the execution of his codicil and Mr. Hyer's death in 1957 the average annual surplus amounted to more than $28,000, and by the end of that year the aggregate surplus exceeded $350,000 at cost and considerably more in market value. In this background Mr. Hyer made an unconditional gift of additional income, which would almost certainly produce larger surpluses. Instead of providing for a gift of whatever part of the 5% of net income might be necessary to balance The Home's operating budget Mr. Hyer unequivocally

and unconditionally directed that all of the 5% be paid to The Home, without mentioning the matter of surplus funds.

 Since none of the three gift-over contingencies came to pass Drury is not entitled to any of the income of the Hyer trust at this time. In view of our holding that Drury is entitled to nothing at this time it is not necessary to pursue Drury's modified claim that it is entitled to a pro rata distribution of the surplus. Nor is it necessary to dwell at length on the language of the codicil providing that when one of the three conditions takes place "then said [gift] shall thereafter be paid to Drury * * *," other than to emphasize that the words "then" and "thereafter" plainly indicate an intention that Drury's participation, if and when it shall occur in the future, shall not include past accumulations but is limited to increment accruing after the happening of the condition.

Our decision does not foreclose Drury for all time. If any one of the three contingencies provided for in the codicil occurs, then the income from the Hyer trust thereafter accruing shall be payable to Drury.

 This decision upholds the trial court in all things except one. There is no justification under the articles of agreement, the three trust indentures or under the law, for the trial court's Conclusion of Law No. 5, or that portion of Paragraph 3 of its judgment proper, limiting the implementation of the financial obligations of The Home under the affiliation agreement to surplus funds available to The Home "other than the funds originating, or which will originate, from the Hyer trust." The board of directors have the power and right to devote its surplus funds to the payment of its obligations under that agreement according to the will of the majority of the members of the board, regardless of the origin of the funds, without judicial direction or interference. The circuit court is directed to modify its Conclusion of Law No. 5 and Paragraph 3 of the judgment in this respect.

The judgment and decree of the circuit court is affirmed as thus modified, and the cause is remanded for the purpose of amendment of the records of the circuit court to conform to the requirements of this opinion.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., and HOLMAN, J., concur.

HOWARD, Special Judge, dissents.

STORCKMAN, J., not sitting.