684 A.2d 123

**In re the BARNES FOUNDATION, a Corporation.**

**Appeal of BARNES FOUNDATION
and its Trustees, Appellants.**

**ESTATE OF Violette DE MAZIA, Deceased.**

**Appeal of BARNES FOUNDATION
and its Trustees, Appellants.**

Superior Court of Pennsylvania.

Argued March 13, 1996.

Filed Sept. 9, 1996.

Bruce W. Kauffman, Philadelphia, for appellants.

Arthur L. Jenkins, Jr., Norristown, for "Students" of the Barnes Foundation, participating party.

Marvin Garfinkel, Philadelphia, for de Mazia Trust, participating party.

Before CAVANAUGH, KELLY and OLSZEWSKI, JJ.

KELLY, Judge.

This appeal is brought from an Order of the Orphans' Court Division of the Court of Common Pleas of Montgomery County, refusing to accept a settlement proposed by appellant, The Barnes Foundation, and appellees, the Trustees of The de Mazia Trust. We reverse.

The full procedural history is extensive but nonetheless relevant to an understanding of the relationship between these parties. In his opinion in support, the Honorable Stanley R. Ott ably summarized that history which we here reproduce.

On March 20, 1991, the Board of Trustees under the trust indenture and agreement executed by and between Dr. Alfred C. Barnes and the Barnes Foundation under date of December 6, 1922, as amended, filed a petition to amend the trust indenture and Articles IX and X of the bylaws of the Foundation. The petition set forth that the Barnes Foundation is a public charity created by Dr. Barnes for the advancement of education and the appreciation of the fine arts. The Foundation's extensive collection of works of art is housed in its buildings in Merion, Pennsylvania. The petition alleged that certain of the conditions contained in the instant trust instrument "have become impracticable and have caused or contributed to or will soon cause the frustration or defeat of the intent and purposes of the trust." The provisions which the petition sought to amend included: (1) the prohibition against ever loaning, selling or otherwise disposing of any picture, (2) the restrictive investment policy, and (3) the admission policy of the art gallery.

\*     \*     \*     \*     \*     \*

The Barnes Trustee' March 20, 1991 petition to amend trust averred that escalating costs were jeopardizing the maintenance and preservation of the art collection, and thereby placing at risk Dr. Barnes' purposes of promoting the advancement of education and the appreciation of the fine arts. The petition sought permission "to sell a painting, or a number of paintings, not to exceed fifteen (15) paintings. The Trustees asked to be able to use the monies generated

from the sale(s) to engage in a capital improvement/maintenance program to enhance the security system at the art gallery, to facilitate increased public use of the arboretum and art gallery, as well as to maintain and preserve the art treasures contained in the collection. The Trustees also sought to establish a perpetual endowment fund to cover expenses, and to have removed the existing investment restrictions and the present limits on hours of operation and the admission fee. The petition also requested authority to rearrange the paintings on the gallery walls to utilize more aesthetically any space created by the sale of paintings, and to "take any other action regarding the physical facilities, collection, art gallery, arboretum, properties or any other interests of the Foundation which will benefit and best carry out the purposes and intent of the trust."

On July 11, 1991, an amended petition to amend the trust indenture was filed by the Barnes Trustees. The amended petition repeated the previous requests to expand the Trustees' investment powers and the admission policies and fees, but did not contain the other prayers for relief listed *supra* (including permission to sell art work.) The amended petition added a request for approval to hold social affairs in the Foundation's buildings, a deviation from the language in Paragraph 33 of the indenture prohibiting "any society functions commonly designated receptions, tea parties, dinners, banquets, dances, musicales or similar affairs, whether such functions be given by officials, Trustees or employes of The Barnes Foundation or any other person or persons whatsoever, or whether such functions be private or public."

By order dated July 30, 1991, the late Honorable Louis D. Stefan granted certain Students of the Barnes Foundation permission to intervene in these proceedings for the purpose of providing the court with information about the educational process and curriculum of the Foundation's Art Department from the perspective of current and future students.

On August 6, 1991, Marcelle G. Pick, one of the two Trustees of the trust under the will of Violette de Mazia, filed a

petition to intervene in this matter. Violette de Mazia had served as Director of Education of the Barnesian art education program for approximately fifty years before her death in November of 1987. In her will, she established a charitable trust for the benefit of the Barnes Foundation. By order dated August 29, 1991, Judge Stefan granted the de Mazia Trustees' petition to intervene. In their answer to the Barnes Trustees' amended petition to amend the trust indenture, the de Mazia Trustees opposed the expansion of hours of operation for the reason that added public access could affect adversely the art education program. The de Mazia Trustees also opposed the request for permission to hold social functions on the grounds the current prohibition improves security and avoids potential conflicts with the art education program.

... [O]n January 10, 1992, the Barnes Trustees filed a withdrawal of their petitions to amend the trust indenture. On January 16, 1992, the de Mazia Trustees petitioned the court to strike the withdrawal of the petitions of the Barnes Trustees, a request in which the Attorney General of the Commonwealth of Pennsylvania as *parens patriae* for charities, joined.

At the same time they filed the petition to strike the withdrawal of the Barnes' petitions, the de Mazia Trustees filed a petition to remove and surcharge the members of the Board of Trustees of the Barnes Foundation and set aside the contract between the Foundation and Alfred E. Knopf, Inc. The removal petition alleged that Dr. Barnes' trust indenture provided for four of the Trustees to be elected by persons nominated by Lincoln University, with Girard Trust Company (now Mellon Bank, N.A.) serving as the fifth Trustee. The petition sets forth that three of the present Trustees are also members of the board of Trustees of Lincoln University, and the president of the Barnes Foundation, Richard H. Glanton, Esquire, is counsel to the University.

The petition to remove and surcharge stated that no catalogue of the Barnes Foundation's extensive art collection

had ever been published, and that there was intense interest in the art publishing industry to obtain the rights to publish one or more such catalogues. The petition averred that the Barnes Trustees "used the catalogue contract to induce the Samuel I. Newhouse Foundation, Inc. to make a two million dollar contribution to Lincoln University in the spring of 1991. Shortly thereafter, the Foundation awarded the catalogue contract to Alfred E. Knopf, Inc. The president of the Newhouse Foundation is Samuel I. Newhouse, Jr. The Chairman of the Board of Knopf's parent company is the Samuel I. Newhouse, Jr." The petition also alleged that the Barnes Trustees refused to consider proposals from other publishing houses. The petition contended the Barnes Trustees should be removed because they had breached their fiduciary duty to the Foundation, had converted an asset of the Foundation for the benefit of Lincoln University, were in a position of conflict in light of their obligations to both the Foundation and the University, had mismanaged the trust, and failed to preserve the Barnesian art education program. The petition asked that the Barnes Trustees be surcharged in the amount of two million dollars.

On January 22, 1992, the de Mazia Trustees filed an amended petition to remove and surcharge and set aside the contract, which reiterated the allegations in the original petition and added a count alleging the Barnes Trustees' action in awarding the contract to Knopf constituted self-dealing.

By decree dated January 23, 1992, Judge Stefan struck the withdrawal of the Barnes Trustees' petitions to amend the trust indenture and ordered that discovery proceed as planned.

On February 14, 1992, the Friends of the Barnes Foundation, an unincorporated nonprofit association whose membership is comprised of present and former students of the Art Department of the Barnes Foundation and their spouses, were granted permission by Judge Stefan to intervene in these proceedings. The Friends joined in the amended petition of the de Mazia Trustees to remove and surcharge

the Barnes Trustees and to set aside the contract with Alfred E. Knopf, Inc. In their answer filed February 18, 1992 to the Barnes Trustees' amended petition to amend the trust indenture, the Friends asserted that the primary mission of the Foundation is educational and that increased hours of admission and the staging of social events at the foundation would interfere with this mission.

On February 20, 1992, the Barnes Trustees filed their answer and new matter to the de Mazia Trustees' amended petition for removal and surcharge. The answer denied that the Foundation's sole mission is advancement of the Barnesian art education program and asserted that the purposes include the promotion of the advancement of education and the appreciation of the fine arts beyond the Barnesian method. Regarding the catalogue contract, the Trustees denied the allegation that they had dealt only with Knopf, and listed other publishers with whom they had discussions. The Trustees contended the decision to choose Knopf was made after a competitive bidding process and with the assistance of a committee of knowledgeable art professionals who are not affiliated with the Barnes Foundation. It was asserted that it was not until after Richard Glanton made his decision "to recommend Knopf to the Board of Trustees to publish the Barnes volumes, that Mr. Newhouse expressed an interest in possibly assisting [Lincoln] University in which Dr. Barnes had taken an interest and which he by amendment had named to oversee the Barnes Foundation. Mr. Glanton conveyed Mr. Newhouse's interest to Lincoln University and thereafter had no involvement in discussions between the Newhouse Foundation and Lincoln." The answer denied any and all allegations of self-dealing, conflict of interest, and breach of fiduciary duty.

On April 1, 1992, the Barnes Trustees filed a second amended petition to amend trust indenture and agreement. This petition repeated the requests for permission to expand the investment restrictions in the indenture, to increase the hours of public admission and the fee for same and to hold social functions at the Foundation in order to attract poten-

tial donors. The second amended petition added a request to send some of the Foundation's paintings on an international tour to raise funds to pay for necessary renovations and system upgrades at the facility in Merion.

On April 28, 1992, the de Mazia Trustees filed an answer to the Barnes Foundation's second amended petition to amend trust indenture, alleging the foundation's proposed deviations from Dr. Barnes' terms exceed the scope of Section 6110 of the PEF Code, which the Foundation cited as the Authority for the requested changes. The de Mazia Trustees alleged that Section 6110 mandates that any changes in the administration of a charitable organization should be tailored so as to fulfill the conveyor's intention as nearly as possible, yet the Foundation seeks permission to institute sweeping changes and to exercise broad discretion not envisioned by Dr. Barnes. In particular, the de Mazia Trustees asserted the Foundation exhibited indifference to its primary purpose, i.e, the Barnesian educational program. They averred that the Barnes Trustees' vision of running the Foundation primarily as a museum at the expense of the educational program is at odds with Dr. Barnes' philosophy.

In their answer to the second amended petition to amend trust indenture, the de Mazia Trustees also opposed sending any of the Foundation's art work on tour because of disruption to the educational program. They urged that the Foundation's art collection, if removed from the gallery walls for renovation of the facility, should be moved to one single location where the art classes could continue uninterrupted.

On July 21, 1992, after three days of continuous hearings, Judge Stefan issued an adjudication and decree sur the second amended petition of the Trustees, which was limited to the issues of permitting the paintings to go on tour and the proposed renovations at the Barnes Foundation's buildings. Judge Stefan determined that a single tour to various venues should be permitted as a one-time deviation from the terms of the indenture prohibiting the loan of any work of

art. [This decision was affirmed *per curiam* by this Court on April 14, 1993].

On August 7, 1992, the Barnes Trustees filed a petition in the matter of the Estate of Violette de Mazia seeking *inter alia*, a complete list of all works of art possessed by the de Mazia Estate, and the removal and surcharge of the de Mazia Trustees. The petition alleged Miss de Mazia, in her capacity as Director of Education of the art department at the Barnes Foundation, caused "an unknown number of works of art owned by the Foundation to be wrongfully transferred to her personal residence ..." The petition further alleged that Miss de Mazia had been totally opposed to Dr. Barnes' decision to vest the power to nominate Trustees of the Foundation in Lincoln University and "being unable to modify his Indenture, she created the de Mazia Trust, the corpus of which she has been wrongfully appropriated from the Foundation, for the sole and deliberate purpose of establishing and maintaining her own authority, dominion, and control over the Foundation following her own death, to the detriment of the Foundation." Following the death of Miss de Mazia it was contended her co-executrices/co-trustees caused to be sold by Christie's auction house these works of art for $8,000,000 +, which amount was transferred to the de Mazia Estate and/or the de Mazia Trust.

The de Mazia Trustees filed preliminary objections to the Barnes Trustees' petition regarding the paintings.

On September 17, 1993, the Barnes Trustees filed a petition for citation seeking an accounting from the de Mazia Trustees. The Petition set forth that a memorandum of understanding dated February 17, 1990, between the Foundation and the Trust required that the latter provide an annual accounting of expenditures to the former and that no accounting had been filed since the de Mazia Trust's inception. The de Mazia Trustees filed a petition for stay of accounting on the same day which alleged that the Barnes Trustees' petition regarding the paintings was filed in retaliation for the de Mazia Trustees' filing a petition for the removal and

surcharge of the Barnes Trustees; that the Barnes Trustees' purpose throughout these proceedings has been to discover the fees and costs paid by the de Mazia Trustees in prosecuting and defending these actions; and that the Barnes Trustees sought this information "not for any legitimate reason, but solely in an attempt to harass, embarrass and intimidate the de Mazia Trustees." The de Mazia Trustees asserted that Judge Stefan had already ruled in a memorandum opinion and order dated July 29, 1993, that the amount paid by them in counsel fees was not discoverable, and that the new petition for an accounting was an attempt to circumvent this decision. The de Mazia Trustees also filed an answer to the Barnes Trustees petition seeking an accounting, denying the Barnes' Trustees were entitled to same.

On October 22, 1993, the Barnes Trustees filed a petition requesting court approval to add two additional venues to the tour authorized by Judge Stefan's July 21, 1992 adjudication and decree. This request was again strenuously opposed by the de Mazia Trustees and other interested parties. After three days of hearings, Judge Stefan approved the new tour sites, by adjudication and decree dated February 1, 1994.

*Barnes Foundation-de Mazia Trust,* 15 Pa.Fiduc.2d 322, 323–29 (1995). The above history set the stage for the filing which has given rise to this appeal.

On February 21, 1995, the Trustees of the de Mazia Trust and the Barnes Foundation filed with the Court of Common Pleas a joint petition seeking court approval of a settlement.[1] The petition stated that the parties wished to settle countervailing suits which had been filed by one against the other and that the parties wished to terminate a relationship which had become increasingly contentious and litigious. The parties averred that the proposed settlement represented a fair and just settlement and would, *inter alia,* save both the parties substantial time, money and effort. The settlement required

1. This petition was filed pursuant to § 3323(a) of the Probate, Estates and Fiduciaries Code. Act of June 20, 1972, P.L. 508, No. 164 § 2.

court approval of those terms modifying the de Mazia testamentary trust. In summary, the proposed settlement provided:

The de Mazia Trust would contribute to the Foundation $2,750,000.00 over six years for the support of the Barnes Art Education Program of the Foundation, to be used by the Foundation to pay the direct expenses of the program: the Foundation would not be required to account to the de Mazia Trust regarding the application of such funds.

The de Mazia Trust would cease to be a support organization for the benefit of the Foundation; it would be restructured as a private organization whose purpose would be to advance, teach, study, promote and otherwise support aesthetics and appreciation of art based on the theories, methods and approaches of Dr. Albert Barnes. The de Mazia organization would be able to make grants for the purpose of furthering Dr. Barnes' theories to individuals or organizations, which may or may not include the Barnes Foundation.

A principal function of the Foundation would be to teach promote and advance the methods and teachings espoused by Dr. Barnes; accordingly, the Foundation would maintain a Barnesian Art Education Program in good faith on a permanent basis.

If the Foundation become financially unable to fund the Barnesian Art Education Program as described in the agreement, it could modify the program to the extent necessary to protect and preserve its art collection and its existing facilities.

The parties agreed to the cessation of the litigation *inter se.*

Access to the Barnes gallery "will be provided to groups and individuals in conjunction with the activities and programs of the de Mazia Trust."

Each party agreed not to raise any objections to any accounting filed by the other.

The de Mazia Trust agreed it had no standing to challenge "any actions of the Foundation ... including actions which the de Mazia Trust considers inconsistent" with Dr. Barnes'

trust indenture; and the de Mazia Trust agreed not to oppose the Foundation's outstanding second amended petition to amend the trust indenture.

*See* Petitioner's Exhibit No. 1.

As stated above, in order for this settlement to be viable, certain terms and conditions of the original de Mazia trust instrument had to be modified to permit the de Mazia trust to cease its existence as a support organization and to function independently as a private charitable organization. On February 22, 1995, the de Mazia trustees filed a petition to amend the charitable trust, seeking to bring its provisions in conformity with the proposed settlement agreement.[2]

A hearing was held before the Honorable Stanley R. Ott. There, appellant and appellee presented testimony on behalf of each group advocating the acceptance of the settlement, as well as the grant of permission to amend the trust. The only dissonant voice was provided by the attorney representing a somewhat amorphous group described as "Students of The Barnes Foundation."[3] Also at the hearing was an attorney from the Office of the Attorney General of Pennsylvania representing the citizens of Pennsylvania as *parens patriae.* The citizens' representative explicitly took no position on the proposed settlement. At the close of the hearing, Judge Ott asked for written arguments from the parties and specifically directed the Office of the Attorney General to evaluate the settlement and to state a position for or against it. In response to that directive, the Attorney General provided the following written statement.

> The Office of Attorney General supports the Petition to Amend the Charitable Trust Established Under the Will of Violette de Mazia, and the severing of the relationship

---

**2.** We note that the de Mazia trustees also sought permission to have a third trustee appointed to administer the trust. That issue, however, is not before this Court.

**3.** At the hearing, there was a contested issue related to this group's standing. Judge Ott decided he need not resolve this issue, and no express determination was made.

between it and The Barnes Foundation because it is in the best interest of the people of the Commonwealth.

The events of the past several years demonstrated that The Barnes Foundation and the de Mazia Trust disagree on the nature of, and the means by which each charitable institution will accomplish, their related missions. While the charitable vision of Dr. Barnes and of Ms. de Mazia may have once been identical or compatible, they are now executed by two groups of trustees who have different perspectives on how to fulfill their goals. Since each charitable program is independently valid and the decisions of each group of trustees entitled to considerable deference, the Commonwealth believes that the public interest would best be served by allowing each to pursue its own program independently rather than be tied to the other with the resultant disharmony, disagreement, and litigation that has ensued.

The Commonwealth believes that severing the relationship will not result in the diversion of any charitable assets, but simply a reallocation of them between the two surviving charitable entities. The Commonwealth seeks to avoid the expenditure of vast sums of charitable dollars on future litigation to reconcile what may be the irreconcilable visions of the two groups of trustees.

After considering the testimony and arguments of the parties, Judge Ott entered the following order:

AND NOW, this 10th day of July, 1995, after hearing and consideration of briefs of counsel, the Petition filed on behalf of the de Mazia Trust seeking to amend the charitable trust established under the will of Violette de Mazia is DENIED on the grounds that the doctrine of deviation is inapplicable and no other bases for allowing the amendments have been demonstrated. The joint Petition filed on behalf of the Barnes Foundation and the de Mazia Trust is hereby rendered moot.

This Order was founded upon Judge Ott's conclusion that "[t]he Barnes Foundation continues to meet the criteria required of a 'support organization' as defined in Miss de

Mazia's will." *Barnes Foundation-de Mazia Trust, supra* at 337. As a result, the court held that the sanctity of the donor's written intent should be upheld, and that the proposed settlement and amendment would violate the intent of the de Mazia trust.

This appeal followed. It was initiated by the Barnes Foundation. However, the trustees of the de Mazia trust, although technically designated as appellees, are also seeking a reversal of the trial court's order.[4] It is only the aforementioned "Students" who have filed a brief in support of the order. Unfortunately, the Students have nowhere established their entitlement to standing in this particular dispute, and based on our review of the record, and the prior litigation involving these parties,[5] we see no foundation for affording standing to the Students in this particular dispute.

Standing requires a substantial, direct and immediate interest in the subject matter of the litigation. *William Penn Parking Garage v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975).

> A "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A "direct" interest requires a showing that the matter complained of caused harm to the party's interest. An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question.

*South Whitehall Twp. Police Service v. South Whitehall Twp.,* 521 Pa. 82, 86–87, 555 A.2d 793, 795 (1988) (citations omitted). Given the respective disputes of the de Mazia trust and the Barnes Foundation, we fail to see how the "Students," however that body is constituted, have standing in contesting the

4. *See generally* Pa.R.App.P. 908 which addresses appellees "who support the position of the appellant."

5. *See In re: The Barnes Foundation,* 449 Pa.Super. 81, 83–84, 672 A.2d 1364, 1365 (1996).

proposed settlement. They have demonstrated no harm that would accrue to them if the settlement were affirmed. In fact, if the settlement were permitted, the Barnes' students would immediately benefit in two ways: the Foundation would no longer be dissipating assets and the Foundation would receive a total of 2.75 million dollars dedicated to promoting and teaching the Barnesian method. Moreover, their arguments both here and in the court below are directed to presuming to act in the interest of the public, an interest which is already represented by the Attorney General, and which this Court has previously held affords them no standing. *See In re Barnes Foundation; Appeal of Tinari,* 443 Pa.Super. 369, 378, 661 A.2d 889, 894 (1995). Hence, the group designated as "Students of the Barnes Foundation" is dismissed from this litigation on the basis of lack of standing.

Turning our attention to the decision of Judge Ott, and his opinion in support thereof, the judge refused to "sanction the requested amendments to the trust provision of Miss de Mazia's will," because he believed that these amendments ran directly counter to the express will of Violette de Mazia and that there were no legal exceptions upon which to alter the terms of the will. We disagree.

A threshold question in this appeal, and not one addressed by the parties, is what is the applicable scope and standard of review.[6]

> Our review of this case is guided by the principles that the scope of appellate review of a decree in equity is particularly limited, *Lynch v. Hook,* 298 Pa.Super. 27, 444 A.2d 157 (1982), and that the findings of the Chancellor will not be reversed unless it appears that the Chancellor clearly committed an abuse of discretion or an error of law. *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412 (1981). Where credibility of witnesses is important to a determination, the findings of the Chancellor are entitled to particular weight because the

6. Under Pa.R.A.P. 3518(a), the brief of appellant should have contained a "statement of the scope and standard of review for each contention." The failure to include such a statement can be grounds for dismissal. *See* Pa.R.A.P. 2101.

Chancellor has the opportunity to observe their demeanor. *Frowen v. Blank, supra; Bedillion v. W.A. Wilson Stave Co., Inc.,* 271 Pa.Super. 292, 413 A.2d 411 (1979). Although an appeals court cannot sit as a trier of issues of fact and must accept the findings of fact of the lower court as the basis of its review, *Lynch v. Hook, supra,* an appellate court is not bound to accept the findings of the Chancellor which are without support in the record or have merely been derived from other facts. *Frowen v. Blank, supra; In re McKinley's Estate,* 461 Pa. 731, 337 A.2d 851 (1970). Thus, the Chancellor's conclusions of law or fact which are derived from nothing more than reasoning from underlying facts and not involving a determination of credibility of witnesses, are reviewable. *Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273 (1976); *Krosnar v. Schmidt Krosnar McNaughton Garrett Co.,* 282 Pa.Super. 526, 423 A.2d 370 (1980).

*Dudash v. Dudash,* 313 Pa.Super. 547, 552–53, 460 A.2d 323, 326 (1983).

We note at the outset that we have found no Pennsylvania appellate authority directly on point to aid our resolution of this issue. All parties agree, however, as did Judge Ott, that modification of the de Mazia trust is being sought under principles of deviation.

█ The doctrine of deviation has been summarized in the Restatement (Second) of Trusts:

[A] court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.

Restatement (Second) of Trusts § 381 (1959). Those terms subject to deviation are limited to administrative provisions of the trust, *i.e.,* "the details of administration which the settlor has prescribed in order to secure the more important result of obtaining for the beneficiaries the advantages which the set-

tlor stated he wished them to have." § 561 Bogert, The Law of Trust and Trustees, at 27.

■ In order to permit deviation from the administrative provisions of a trust, courts generally require the presence of two elements: "(1) unforeseen and unforeseeable change in circumstances, and (2) a frustration of the settlor's main objectives by this change, if strict obedience to the settlor directions were required." *Bogert, supra* at 230. It must be emphasized that the relief afforded by deviation is not based on mere convenience, but on the necessity of effecting a change in a situation where compliance with the terms of the trust "would defeat or substantially impair the accomplishment of the purposes of the trust." *Colin McK. Grant Home v. Medlock,* 292 S.C. 466, 472, 349 S.E.2d 655, 659 (1986). Under these circumstances, a court may direct or permit a trustee to accomplish acts that are unauthorized or even forbidden by the terms of the trust. *See South Carolina National Bank v. Bonds,* 260 S.C. 327, 341, 195 S.E.2d 835, 842 (1973) (citing Restatement (Second) of Trusts) § 381(d).[7] The doctrine of deviation has been utilized in a number of different situations to modify or alter explicit trust terms in order to accomplish a settlor's ultimate objective.

In *Estate of Craig and St. Joseph's Hospital and Medical Center v. Hansgen, et al.,* 174 Ariz. 228, 848 P.2d 313 (1993), a hospital petitioned for court-ordered permission to deviate from the terms of a testamentary trust. At issue was a trust created in 1933 which provided, *inter alia,* for the gift of a sum of one hundred, fifty thousand dollars to the hospital for the express purpose of erecting a tuberculosis hospital. The gift was to vest upon the death of the decedent's wife and daughter, the last of whom died in 1987. Although a gift of

7. It was pursuant to the principle of deviation that the Court of Common Pleas of Philadelphia approved of modifications to the famous Will of Stephen Girard. *See In re Girard Estate,* 27 Pa.Fiduc. 545 (1977). *See also Girard Will Case,* 386 Pa. 548, 127 A.2d 287 (1956), *reversed Pennsylvania v. Board of Trusts,* 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); *In re Girard College Trusteeship,* 391 Pa. 434, 138 A.2d 844 (1958); *Girard Clarification Petition,* 423 Pa. 297, 224 A.2d 761 (1966).

one hundred, fifty thousand dollars may have provided for the erection of a structure dedicated to the cure of tuberculosis in 1933, by 1987 the testimony demonstrated that the sum would only pay for the construction of the equivalent of a single "bed."

Additionally, the testimony established that modern day medicine had advanced to a stage where most tuberculosis patients were treated on an out-patient basis, and that the relative incidence of tuberculosis in Arizona had dramatically declined since the testator's death.

The Arizona appellate court was convinced that because "the change in circumstances between 1933 and the present has made the construction of a separate building unfeasible, uneconomical and wasteful ... its construction 'would substantially impair the accomplishment of the purposes of the trust.'" *Id.* at 237, 848 P.2d at 322. The court thereupon ordered an alternative use for the money to allow the "hospital to use the $150,000.00 to renovate and equip existing facilities to be used for the treatment of patients with tuberculosis."

The court relied on the fact that, "[t]he dominant purpose behind [the settlor's] trust was to use his wealth to help people suffering from tuberculosis." Therefore, the court held that "a deviation from the express terms of the trust was appropriate to carry out [the settlor's] intentions." *Id.* at 239, 848 P.2d at 324.

In *Orphan Society of Lexington v. Board of Education of Lexington,* 437 S.W.2d 194 (Ky.App.1969), the Court of Appeals of the Commonwealth of Kentucky held that the closing of a public "model" school, which had been the sole designated beneficiary of a trust, did not cause the trust to fail when the children which that school served were transferred to a neighboring school. Because the intention of the settlor was to aid public education in general, and the children of a certain section of Lexington in particular, the appellate court agreed with the trial court's observation that "[t]he fact that the [students have] been changed from one place to another cannot be held to have created a situation whereby, ... [the

settlor's] specific payment is impossible of performance." *Id.* at 198. The court then held that the income from the trust could still be used for the benefit of the children from the same community despite the fact that they had been transferred to a different school in a different section of the city.

In *Reed v. Eagleton*, 384 S.W.2d 578 (Mo.1964), the decedent had established a testamentary trust to benefit the town of St. Joseph, Missouri. By the express terms of the trust, the principal and accumulated income were to be used for the purpose of acquiring "public parks, playgrounds, athletic fields, including baseball diamonds and grounds, tennis courts, and a zoological garden, if financially possible, all for the use and benefit of the citizens." *Id.* at 580. The trust further provided that it was decedent's "desire that the trust estate be utilized to confer the widest possible benefits among all the citizens." *Id.* at 580. The trust did not provide for the maintenance of the land acquired but instead called for the land to be conveyed to the town in fee.

The decedent died in 1957. By 1959, the trust corpus exceeded 3.4 million dollars. Unfortunately, the town of St. Joseph was not so fortunate. It was in dire financial straits and by 1961, city officials informed the trustees that the town could accept no benefits from the trust because it, the town, could not provide maintenance or improvement service for any more recreational land.

The trustees filed an action seeking court direction on the administration of the trust. At the outset of its discussion, the Supreme Court of Missouri stated "the accomplishment of the ultimate purpose of the testator is the matter of paramount importance and its achievement must be the object of any judicial permission to alter or deviate from the trust terms." *Id.* at 586. The Court then, after delineating the town's financial inability to care for more land, found "that no better use could be made of [the trust] to accomplish [decedent's] purpose than to use that income for development and maintenance of the tracts purchased with the trust funds." *Id.* at 588. Thus, the court permitted trust funds to be used for a

purpose, *i.e.* development and maintenance, not provided in the trust itself.

In the matter of *In Re Trust Created by the Last Will and Testament of John L. Teeters,* 205 Neb. 576, 288 N.W.2d 735 (1980), the decedent had, by the terms of his 1946 will, bequeathed the sum of twenty thousand dollars to Lincoln General Hospital, the net income of which was to be used for the benefit of "nurses, student nurses, the School of Nursing and any employee of Lincoln General Hospital residing in the Sophey H. Teeters Nurses' Home." *Id.* at 577, 288 N.W.2d at 737. In 1975, Lincoln General Hospital ceased to operate a school of nursing, and there were no longer nurses or anyone else residing in the nurses' home; the home itself became an adjunct building to the hospital in which chemically dependent patients were treated.

Relying on the matter of *Dartmouth College v. Quincy,* 357 Mass. 521, 258 N.E.2d 745 (1970), which involved the admission of "non Quincy" girls to a Quincy school which had failing attendance, the Court stated:

> We think that the present case is one where the means and detailed methods stated by the testator 'must have been subordinate in his mind to the [predominate charitable] end which he had in view.... We think that the proposal now before us is ... a proper method of carrying on ... [the testator's] primary charitable trust without violation of any of its basis charitable purposes.

*Id.* at 582, 288 N.W.2d at 739. The Court in *Teeters* held that even though the School of Nursing no longer existed and the Teeters home was no longer a residential facility, "all the categories of actual persons in the classes [i.e. nurses, student nurses, employees] still exist[ed] and may be served." *Id.* at 584, 288 N.W.2d at 740. Therefore, the Court held that Lincoln General Hospital was entitled to remain as beneficiary and the use of the funds could deviate to be used for the benefit of the categories described in Mr. Teeters' will by providing "amenities such as lounge and recreation furnishing[s], for student nurses, licensed nurses, and other employees" of the hospital in the lounges and recreation area of the

Teeters Home and the Lincoln General Hospital. *Id.* at 579, 288 N.W.2d at 738.

In *First National Bank v. Heirs of Donnelly,* 96 Ohio App. 509, 122 N.E.2d 672 (1954), the Court of Appeal of Ohio permitted the deviation from the terms of a will which provided for the disbursement of a trust estate to "a Catholic Orphanage located in [decedent's] County ... [and] if there be none located in said county, then my said trustee is authorized and directed to expend the entire ... trust estate for the establishment of such a Catholic Orphanage." *Id.* at 510, 122 N.E.2d at 674. At the time this bequest vested there was no such orphanage in decedent's county and the size of the bequest ($21,000.00) was insufficient to build one. The Court looked to the primary object and intent of the donor and concluded that that intent was to care for "Catholic orphans from" decedent's particular county. Thus, the court permitted the distribution of the funds to the Catholic orphanage in the neighboring county which actually cared for the orphan children (regardless of creed or color) of decedent's county. In arriving at this conclusion, the Court noted that its resolution "was not a deviation from the founders' intention as to the objects of his charity, but only from the founders' direction as to the management of his money, a varying of administrative duties which were no doubt originally meant to be governed by circumstances." *Id.* at 515, 122 N.E.2d at 676.

In *Cleveland Museum of Art v. O'Neill,* 72 Ohio L.Abs. 11, 129 N.E.2d 669 (1955), an art museum sought permission to deviate from the terms of several trusts which had been established specifically for the acquisition of art. Over the years, the existing museum no longer had the space to adequately display the art which had been purchased by the trusts. Consequently, the museum sought to use the income from the trusts to expand the museum's physical facilities. The Court, in permitting this previously unauthorized use of trust income, stated,

It is clear that there is no failure of the purpose which the settlors made manifest in their respective trusts.... But circumstances beyond the vision of the settlors today threat-

en to defeat the accomplishment of the very purpose which they had in mind. Lack of space now means loss of pictures for public enjoyment.... The evidence indicates that the need has changed, but that the long-range purpose remains the same, namely, the maintenance of an outstanding Museum of Art.

*Id.* at 13, 129 N.E.2d at 671.

In *Colin McK. Grant Home v. Medlock,* 292 S.C. 466, 349 S.E.2d 655 (1986), the Supreme Court of South Carolina was confronted with a petition by the trustee of a testamentary trust who wished to sell real estate upon which existed a nursing home which had been provided for the care of "elderly Presbyterians." Because of gradual dilapidation of the surrounding neighborhood, it was the intent of the trustees to sell the existing buildings and use the proceeds of the sale to build another facility in a different part of town. Despite the fact that the by-laws of the home, at the time of death of the remaining trust settlor, specifically provided that "[t]he Colin M.K. Grant shall *always* be located and conducted in the property at the corner of Hagen and Meeting Streets in the City of Charleston, *as Memorial* to the late Colin C.K. Grant," *Id.* at 471, 349 S.E.2d at 658 [emphasis added], the Court permitted the requested deviation and allowed the sale and the rebuilding of a facility at a separate location.

The Court shared the observation of the trial court that "[t]here is no reason to doubt that if that particular real estate should become unsuitable for [its] purpose, [settlors] would have wished the funds to be used to provide some other means of housing for the intended beneficiaries of the trust. Thus, the use of the specific home they established was merely one method, convenient at the time of the trusts' establishment, for carrying out their intent." *Id.* at 471–72, 349 S.E.2d at 658. The Court then found because the neighborhood in which the home was located had become so dilapidated and unsafe that the purpose of the trust could no longer be carried out, deviation from the terms of the trust was permissible.

In each of the above-cited cases, the respective Court made a thorough effort to avoid the momentary impediment and apply a pragmatic approach to ensuring that the settlor's primary goal be achieved. This pragmatic approach is even more evident in situations where trust estates are embroiled in ongoing litigation, and the parties present a settlement agreement to the Court.

In the case of *Connecticut Bank and Trust Company v. Coffin,* 212 Conn. 678, 563 A.2d 1323 (1989), the Supreme Court of Connecticut was reviewing a trial court's refusal to approve the terms of a settlement agreement which had been reached in a suit filed against the trustee alleging an abuse of discretion in making distributions. The trustee had by the terms of the trust been granted broad discretionary powers to decide who received distributions. The trustee had used this power to make substantial distribution to one party [settlor's son] "while other beneficiaries received little or nothing." *Id.* at 699, 563 A.2d at 1333. Those "other beneficiaries" initiated a suit in federal court.

The settlement agreement provided, among other things, one time distributions of trust principal of $600,000 each to the son's first and present wives in return for their relinquishment of their claims to be beneficiaries of the trust; a plan for a fixed distribution to settlor's sons and five children; and the removal of the spendthrift provisions governing distribution to settlor's son.

In ordering that the settlement agreement be approved, the Supreme Court observed:

> In the present case it is highly probable that the settlor never realized the problems that the provisions of the indenture vesting "absolute discretion" in the corporate trustee to apportion the income among Dexter, Jr., and other beneficiaries without any standard or guide would eventually create. He could never have anticipated that despite the insertion of these spend-thrift provisions to protect against the prodigality of any of the income beneficiaries, there would occur an invasion of the trust corpus for

the benefit of Dexter, Jr., to the extent of more than one million dollars. It is extremely unlikely that he ever envisioned that his desire to provide so generously for the benefit of Dexter, Jr., and the other beneficiaries, as well as to ensure against their improvidence by giving such broad discretion to BCT, would create such great dissension within the Coffin family and threaten to consume a substantial part of the trust corpus in litigation expenses.

*Id.* at 706, 563 A.2d at 1337. The Court further observed:

[W]henever a dispute arises among those claiming to be beneficiaries of a trust or will concerning the interpretation of the instrument and a compromise is reached by them, some deviation from the intention of the settlor or testator is likely to occur. Courts, nevertheless, have deemed it wise to approve such settlements if they are likely to promote the interests of the beneficiaries without any great departure from the purposes of the donor. A. Scholl, Trusts (4th Ed. § 337.6).

*Id.* at 707–08, 563 A.2d at 1337–38.

Moreover, the Court concluded that the trial court's doubt about the ability of one of the parties to prevail on her claim "was not an adequate reason to conclude that the settlor's intentions would be so greatly thwarted by the payment to her of a sum approximating the estimated cost of further litigation that the settlement should be rejected." *Id.* at 708, 563 A.2d at 1338. Finally, the Court held, "[w]hen the provisions of the trust to be altered have resulted in difficulties harmful to the interests of the objects of the settlor's beneficence, and the proposals do not unnecessarily change the settlor's plan or thwart his purposes, the Court should approve them." *Id.* at 709, 563 A.2d at 1338.

In the case of *Thorne v. Continental National Bank and Trust Company of Chicago,* 18 Ill.App.2d 163, 151 N.E.2d 398 (1958), an appellate court of Illinois was reviewing an appeal brought by a trustee from a trial court decree directing it to invade the corpus of a trust for the purpose of settling and terminating litigation between the sole life tenant-remainder-

man and claimants to part of the remainder. The settlor had created two trusts to benefit his wife and son. The son's share consisted of a vested two-thirds interest in the remainder of the trust property in existence at the death of the settlor's wife (who was also the mother of the son). Son died "under unusual circumstances" which, although not specified, had the potential for embarrassing his family and scandalizing his memory. Ten days prior to his death, son had executed a will in which he bequeathed a total of three-fourths of his vested interest to his "fiance" and her mother. Decedent's mother initiated suit to have this will set aside as being the product of undue influence. The primary parties to the suit, being decedent's mother, his fiance and her mother, eventually agreed to settle this action and resolve any claim to the trusts estates. In order to effectuate the settlement, the trustee was required "to pay out and distribute, from the trust corpus, cash and shares of stock." The trustee refused and decedent's mother initiated an action in chancery (equity) to have the trustee comply with the terms of the trust.

The Chancery Court, in directing the trustee to pay out the funds to settle the litigation,

> found that in the prosecution of this acrimonious litigation vast legal expenses had been incurred for attorney's fees and costs; that the continuation of the will contest proceedings would deplete the estate of Montgomery Thorne to a very marked degree and would do great harm to his memory and reputation; that the terms of the will contest settlement agreement are fair and equitable and should be carried into effect; that Gordon Thorne, at the time of signing his will, did not and could not have anticipated the changes in the circumstances which occurred subsequent to his death; and that such unforeseen circumstances constitute an emergency, which justified the court in ordering modification of the terms of the two trusts, in order that the settlement agreement be carried into effect.

*Id.* at 167–68, 151 N.E.2d at 401. The appellate court agreed with these observations. In affirming the approval of the

settlement agreement, the Court included the following pertinent observation:

It is insisted ... [t]hat the terms of the deed, creating the trust, are like iron bands, rigid and unyielding, and that no human power can unloose or even adjust them, no matter what emergency or necessity may arise, even though they may destroy the whole interest designed for the beneficiary, and created by the deed or other instrument by which it is evidenced. *We do not think so great a defect exists in our system of jurisprudence as is assumed by this position.*

*Id.* at 177, 151 N.E.2d at 405 (emphasis supplied) (citing *Curtiss v. Brown,* 29 Ill. 201, 228 (1862)).

■ In light of the above cited examples, where Courts in a variety of situations have seen fit to alter the terms and conditions of trust documents under principles of deviation, we now turn to a consideration of the facts in this case. Instantly, the only trust in issue is the trust established by the terms of the will of Violette de Mazia. The trust was created "exclusively for charitable, literary, and educational purposes." Paragraph Seventh 1.A. It was designed to conform with certain federal tax regulations and listed the Barnes Foundation as the "supported organization." The Barnes Foundation was to continue as the supported organization "so long as it met certain requirements," unless it "withdraws as the charitable supported organization of the Trust," Paragraph Seventh 2.B. or the "Trustees determine in their sole discretion that the purposes of the Trust may not be fulfilled practically." Paragraph Seventh 7.

The trust instrument accords to the trustees power to, *inter alia,* "spend such of the net income and principal of such assets, at such times and in such amounts, as they, in their sole discretion deem appropriate for ... [l]egal, accounting, appraisal and fiduciary express related to the Trust," Paragraph Seventh 4.L; and in the event of the termination of the trust the trustees may choose to support "such charitable entity or entities as they in their sole discretion, unanimously determine most closely compliment the purposes and practices of THE BARNES FOUNDATION as expressed in the ...

quotation of Judge Dewey's concept of education contained in THE BARNES FOUNDATION brochure." [8]

In reviewing the trust, three points are evident: first, the primary intent of Violette de Mazia was to set up a "charitable, literary, and educational" trust for the purpose of carrying on Dr. Barnes' idea of art education; second, the trustees were to be empowered with broad powers and discretion to carry on the work to which Violette de Mazia dedicated a substantial portion of her life and resources; and third, the trust once created should qualify for favorable tax treatment. Under principles applicable to deviation the third point clearly falls into the category of being administrative in nature, and if blind adherence to the trust's tax status would interfere with the accomplishment of Ms. de Mazias' principal intentions it clearly must give way. Hence, prospective tax consequences of the proposed settlement here at issue need not concern us, so long as the effect of the settlement is to advance the primary purposes of the trust.

Turning to the actual terms of the settlement, if accepted the net effect would be as follows: 1) the trustees of the de Mazia trust would pay 2.75 million dollars out of the corpus of a trust which now is comprised of approximately nine million dollars; 2) this payment would be used specifically "for the support of the Barnes Art Education Program," and the Foundation agrees to "maintain a Barnesian Art Education Program in good faith on a permanent basis;" 3) the de Mazia trust would be restructured as a private organization to promote and teach "aesthetics and appreciation of art based

8. The quotation referred to provides:

Education, as indeed any intelligent human activity, results from the interaction between an individual and his environment—an environment which affects the individual and, in turn, is affected by him. The individual and the world are engaged in a constantly—developing situation, and education, therefore, is a continually unfolding process. This interacting process, and this only, leads to genuine experience. From experience arises culture, i.e., the expansion of the range and accuracy of the perceptions. Education, governed by these principles of objective personal experience—the methods of science—develops initiative, inventiveness and the ability to re-adapt one's self to that constantly changing situation, which is life.

on the theories, methods and approaches of Dr. Albert Barnes," and in furtherance of that purpose access to the Barnes gallery "will be provided to groups and individuals in conjunction with the activities and programs of the de Mazia Trust;" 4) the parties will end all pending litigation, which to date has resulted in the expenditure of a great deal of time and money by the Foundation and the trust; and 5) the de Mazia trust essentially waives any standing it might have to challenge future actions taken by the directors of The Barnes Foundation.

In his opinion in support of his decision, Judge Ott stated that he would not permit the requested deviation from the terms of the de Mazia trust because in his view "the sanctity of the donors' written intent [was] more compelling than the immediate but short-sighted benefits of approving the agreements *sub judice.*" *Barnes Foundation, supra* at 338. Although we agree in principle with Judge Ott that the sanctity of the donor's intent should be honored and upheld whenever possible, we are convinced that the benefits of approving the present settlement will go further to advance Ms. de Mazia's intent than forcing the parties to continue in what has obviously become a bad marriage: a marriage which threatens to damage or destroy one or both parties' respective abilities to benefit the citizens of this Commonwealth. This latter concern was obviously at the heart of the position taken by the Attorney General, the statutorily designated guardian of the interest of the general public, who stated: "[T]he public interest would best be served by allowing each [party] to pursue its own program independently rather than be tied to the other with the resultant disharmony, disagreement, and litigation that has ensued." We are compelled to agree. *Cf. In re Little Estate,* 403 Pa. 534, 170 A.2d 106 (1961) (court may not approve family settlement agreement affecting residuary charities without participation of Office of Attorney General).

Accordingly, the order of the Court of Common Pleas is reversed. The requested modifications to the Trust of Viol-

464

ette de Mazia are granted and the Court of Common Pleas is directed to accept the settlement as affirmed by the parties.

Order reversed. Jurisdiction relinquished.