# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Estate of Stephen Girard, Deceased   :
Trust for Girard College   :
  :   No. 2254 C.D. 2014
Appeal of: Board of Directors of City   :   Argued: October 7, 2015
Trusts, Trustee of the Trust under Will   :
of Stephen Girard for Girard College   :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge[1]
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE MARY HANNAH LEAVITT, Judge[2]
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge


**OPINION**
**BY JUDGE SIMPSON**               **FILED: January 21, 2016**


This appeal from a final decree of the Orphans' Court Division of the Court of Common Pleas of Philadelphia County (Orphans' Court)[3] concerns proposed modifications to certain operations of Girard College, a primary and secondary school for disadvantaged youth operated by a charitable trust under the 1830's Will of Stephen Girard. After the Orphans' Court declined to approve the proposed suspension of residential programs and high school grades at the College, the City of Philadelphia, acting through the Board of Directors of City Trusts

---

[1] This case was assigned to the opinion writer on or before December 31, 2015, when President Judge Pellegrini assumed the status of senior judge.

[2] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

[3] The Honorable Joseph D. O'Keefe, then Administrative Judge of the Orphan's Court (now retired) presided.

(Board), Trustee under Girard's Will, appealed to this Court.[4] After careful consideration, we discern no basis to disturb the thoughtful judgment of the Orphans' Court; therefore, we affirm.

## I. Background

## A. Will

By Will and codicils dated 1830 and 1831, Girard left the majority of his considerable estate to charity and for the betterment of the City of Philadelphia (City). He ordered the creation of the College, a boarding school to be located in the City, writing (with emphasis added):

> And, whereas I have been for a long time impressed with the importance of educating the poor, and of placing them, by the early cultivation of their minds and the development of their moral principles, above the many temptations to which, through poverty and ignorance, they are exposed; and I am particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education, as well as a more comfortable maintenance, than they usually receive from the application of public funds ….

Will of Steven Girard, Ex. A to Pet. to Modify Charitable Trust for the Benefit of Girard College Pursuant to 20 Pa. C.S. §7740.3 (Will), Clause XX, at 10; Reproduced Record (R.R.) at 155a. Among other provisions, Girard directed that the College "shall be sufficiently spacious for the residence and accommodation of at least three hundred scholars …." Will, Clause XXI, at 11; R.R. at 156a

---

[4] The Board is a Commonwealth party. See City of Phila. v. Cumberland Cnty. Bd. of Assessment Appeals, 81 A.3d 24 (Pa. 2013). Accordingly, this Court has jurisdiction pursuant to 42 Pa. C.S. §762(a)(1)(ii).

2

(emphasis added).  The Will further requires that the students of the College be "fed … clothed … and <u>lodged</u> in a plain but safe manner …."  <u>Id.</u>, Clause XXI, ¶7 at 17; R.R. at 162a (emphasis added).

By statute, the Pennsylvania legislature created the Board in 1869.  53 P.S. §16365.[5]  The Board administers trusts left to the City for charitable purposes, including the Will and its provisions for Girard College.

**B. Petition**

In 2013, the Board filed a Petition to Modify Charitable Trust for the Benefit of Girard College Pursuant to 20 Pa. C.S. §7740.3 (Petition).  The Petition alleged a decline in the financial state of the Trust, specifically a decrease in the market value of the Residuary Fund, a decline in rental income and a dramatic fall in coal production.  Pet. at ¶¶17-20.  The Petition further alleged that notwithstanding economic cutbacks at the Board and Girard College levels, the Trust income has been insufficient to fund the financial requirements of the College, requiring shortfalls to be funded by the use of Trust principal.  Pet. at ¶¶21-22.  Under the current spending level, and without consideration of significant physical plant renovations that are required, the Board asserted the Residuary Fund would be exhausted within 25 years.  Pet. at ¶¶21-26.  Because Girard College cannot continue operating in the same manner, the Board requested the Orphans' Court to temporarily modify the provisions of the Will to allow the elimination of the residential program and instead provide an extended day program for grades 1 through 8.  Pet. at ¶¶26-34.  The Board asserted the

_____
[5] Act of June 30, 1869, P.L. 1276.

3

residential program is an administrative provision of the Will and requested the Orphans' Court to temporarily modify it pursuant to the 2006 codification of rules for deviation from charitable trusts found at 20 Pa. C.S. §7740.3. Pet. at ¶¶36-38.

## C. Parties and Hearing

Early on, the ensuing litigation focused on party status. The Commonwealth of Pennsylvania, Office of Attorney General, Charitable Trusts and Organizations Section (Office of Attorney General), became an active participant, generally supporting the Board's request for deviation and opposing the addition/appointment of new parties. On the other hand, the Girard College Alumni Association was denied intervenor status (but was later permitted to participate as *amicus curiae*). In addition, the Orphans' Court appointed James F. Mannion, Esq. as *amicus curiae*.

A hearing on the merits was held in July 2014. The evidence regarding past facts was not contested; however, the inferences to be drawn about future developments were disputed. The following summary largely reflects Amicus Mannion's Post Trial Filing with the Orphans' Court.

There have been three primary sources of funding for Girard College over the years: 1) cash from coal and coal royalties; 2) cash generated by the real estate portfolio; and, 3) interest and dividends earned on the Residuary Fund. Notes of Testimony (N.T.), 7/17/14, at 13-16; R.R. at 258a.

4

Joseph Martz, Executive Director and Secretary of the Board, outlined the historical and more recent performance of the coal, real estate and Residuary Fund, including the long-term lease of Girard Square and the redeployment of the proceeds into debt reduction and joint venture real estate interests. N.T. at 19-30; R.R. at 259a-62a. Starting in 1997, the coal operations were not generating cash for the Trust, and in 2007 they were losing approximately $3.3 million per year. N.T. at 23; R.R. at 260a. The 2008 recession negatively impacted the real estate operations by tenants not renewing leases, taking less space and negotiating lower rental rates. N.T. at 33; R.R. at 263a. The Residuary Fund was also negatively impacted by the recession, from a high point of $333 million in September 2007, to $210 million in June 2009, to a low of $197.5 million in September 2011. N.T. at 19; R.R. at 259a; Amicus Ex. 2; R.R. at 683a.

During this time, the expenses of operating the College were exceeding the income generated by coal, real estate and the Residuary Fund, necessitating the sale of the principal of the Trust. N.T. at 47; R.R. at 266a. The Board significantly reduced expenses at the Board level by various steps, including reducing the number of students. N.T. at 39, 44-46; R.R. at 264a-66a. The Board also significantly reduced debt through refinancing and by using a portion of the proceeds of the long-term lease of Girard Square. N.T. at 30, 41-43; R.R. at 262a, 265a; Pet'r's Ex. 1 at 18; R.R. at 327a.

The Board was concerned about the Trust's financial future, and it believed that if the financial situation continued the Trust, and in turn the College, would run out of money. N.T. at 51; R.R. at 267a; Pet'r's Ex. 1 at 24-25; R.R. at

5

333a-34a.  These calculations did not include the cost of physical plant renovations, which were estimated to be around $3.8 million for "deficiency repairs" and in excess of $110 million for complete renovations.  N.T. at 137; R.R. at 289a; Pet'r's Ex. 1 at 22; R.R. at 331a.

The Board concluded that the only prudent way to preserve and build the Residuary Fund was to utilize a 6% spending rate on only the average value of the Residuary Fund to fund the expenses of the College, with a goal of reducing that to 5% and to apply the coal and real estate revenues to rebuild the Residuary Fund.  N.T. at 49-51; R.R. at 267a.  Based on financial projections, the Board concluded that a budget of $11.8 million for the College and $1.6 million for the Board could be supported under such a plan.  N.T. at 55, 87-88; R.R. at 268a, 276a.

In 2012, the Board created the "Girard College Strategic Plan Steering Committee" (Steering Committee).  The Steering Committee reviewed options for the College in light of the $11.8 million budget.  The Steering Committee also reviewed reports from outside consultants, including FSG, an architectural firm, the Institute for Research and Reform in Education, and the Brownstein Corporation.  N.T. at 135-36; R.R. at 288a; Pet'r's Ex. 1 at 3-4; R.R. at 312a-13a. The Steering Committee examined 13 options of keeping the residential program. Pet'r's Ex. 1 at 23; R.R. at 332a.  The Steering Committee concluded the residential program had to be temporarily suspended, and an extended day (concluding after an evening meal), non-residential program for grades 1 through 8 was the most appropriate given the financial limitations and conditions of the

6

physical plant. N.T. at 153-55; R.R. at 293a. The Board accepted the recommendation. Id.

Under the proposal, grades 1 through 8 would be consolidated in the lower school buildings, which were the newest buildings on campus. N.T. 172-73; R.R. at 297a-98a. Four million dollars in renovations to the lower school buildings would be necessary. Id.

The Steering Committee recommendation was premised upon educating 425 day students. N.T. at 122-25; R.R. at 285a-86a. Because of transportation needs, the students who would be able to attend Girard College would be limited geographically to those students able to get to and from the school in a reasonable period of time. N.T. 167-68; R.R. at 296a. No evidence was presented regarding the number of current students who would be able to attend, nor was any evidence presented of how many additional students would be needed to bring the number of students to 425. See id. No study was done to determine if there were 425 eligible students who could attend given the geographic restriction, although Board member Bernard Smalley testified that he had a high degree of certainty that number could be attained. N.T. at 170; R.R. at 297a.

The Board also presented the "Girard College Growback Framework and Transition Initiatives" (Grow Back Plan). Pet'r's Ex. 2; R.R. at 589a-624a. The financial aspects of the Grow Back Plan are premised upon the Residuary Fund reaching $350 million. Projections suggested that it would take no less than

10 years to restore the Residuary Fund. Id. at 8; R.R. at 596a. No specifics of how the residential program would be re-implemented were provided, and the Board stated that it "rejects any suggestion that it should publicly announce *today* what will be sustainable and in the best interests of the Girard students of *tomorrow*." Id. at 8-9; R.R. at 596a-97a (emphasis in original).

Changes occurred after the formation of the Steering Committee in 2011. Coal began producing a $2 million positive cash flow, which at the time of the hearing was expected to continue into the future. N.T. at 70-73; R.R. at 272a-73a; Amicus Ex. 1; R.R. at 682a (excerpt from Grow Back Plan). Real estate began producing a positive cash flow, even with the contribution of $2 million to a sinking fund for physical plant issues. N.T. at 72, 76; R.R. at 272a, 273a. The actual 2013 financial reports reflected a $3.5 million excess of revenues over expenses, with the $2 million sinking fund set aside. N.T. at 76; R.R. at 273a; Amicus Ex. 1; R.R. at 682a. The 2014 projections initially suggested a $15,000 excess of revenues over expenses, but later the performance was expected to be $3 million excess of revenues over expenses, even with the $2 million contribution to the sinking fund. N.T. at 88; R.R. at 276a; Amicus Ex. 1; R.R. at 682a.

During this time, the Residuary Fund increased in value. In September 2011, when the FSG report was commissioned, the Residuary Fund was at its lowest value of $197.6 million. N.T. at 78-79; R.R. at 274a; Amicus Ex. 2; R.R. at 683a. By the time the Steering Committee issued its report, the value of the Residuary Fund increased to approximately $233 million. N.T. at 81; R.R. at 275a; Amicus Ex. 2; R.R. at 683a. From that time to June 30, 2014, the Residuary

8

Fund increased further to $262.2 million. N.T. 19, 79; R.R. at 259a, 274a. These increases in value occurred despite the use of the Residuary Fund principal in the past. N.T. at 84-85; R.R. at 275a-76a. These increases also reflected the reduction of debt service and therefore the need to utilize Residuary Fund principal. Id.

The Board called as an expert witness Howard Brownstein, a business turnaround consultant who authored a report attached as Exhibit A to the Report of the Steering Committee, Petitioners' Exhibit 1. R.R. at 345a-57a. Mr. Brownstein did not agree that modification to the Girard College programs could be delayed in hopes that recent favorable financial trends continue. N.T. at 200-05; R.R. at 304a-06a. Some of the questioning was conducted by the Court. Id.

One future uncertainty concerned the Trust's rental real estate portfolio, especially leases in the ARAMARK Tower. The Board had communications with both the City (lease ending September 2016) and ARAMARK (lease ending September 2018) regarding lease renewals. N.T. 89-90; R.R. at 277a. The loss of the two large leases would place the Trust's rental real estate income into the negative again and place Girard College at risk. Id. More would be known about the City lease renewal by around July 2015, and the ARAMARK lease renewal by around July 2016. Id.

## II. Orphans' Court Decision

The Orphans' Court acknowledged the legal basis for the requested deviation: 20 Pa. C.S. §7740.3, adopted in 2006. The provisions at issue provide:

9

(a) **General rule.--**Except as otherwise provided in subsection (b), if a particular charitable purpose becomes unlawful, impracticable or wasteful:

    (1)  the trust does not fail, in whole or in part;

    (2)  the trust property does not revert to the settlor or the settlor's successors in interest; and

    (3)  the court shall apply cy pres to fulfill as nearly as possible the settlor's charitable intention, whether it be general or specific.

\* \* \* \*

(c) **Administrative deviation.--**A court may modify an administrative provision of a charitable trust to the extent necessary to preserve the trust.

20 Pa. C.S. §7740.3 (a), (c).

## A. Administrative Provisions

The Orphans' Court first addressed the Board's contention that the proposed modifications of the Trust may be considered administrative provisions of the Will, subject to deviation under subsection (c). 20 Pa. C.S. §7740.3(c). The Court noted the distinction between administrative provisions, mechanical means from which deviation may be permitted to secure the more important result of obtaining for the beneficiaries the advantages which the settlor stated he wished them to have, and dispositive clauses, from which deviation is not permitted under the subsection. Orphans' Ct. Op. Sur Decree, 8/21/14 (Orphans' Ct. Op.) at 14. Then, the Court reviewed provisions of the Will quoted above. Id.

The Orphans' Court rejected the argument that the proposed modifications of operations at Girard College relate to administrative provisions of

10

the Will. The Court stated (with emphasis by underline added, emphasis by bold italics in original):

> Girard envisioned a boarding school that would both educate and provide a home for poor orphan boys. Stephen Girard's direction that students were to stay at the college until they could be bound out as apprentices is likewise essential to his vision of a boarding school. According to Girard, students were to '***remain*** in the college until they shall respectively arrive at between fourteen and eighteen years of age.' At the time it was common practice for overseers of the poor to apprentice children whose parents were unable to maintain them. Stephen Girard's direction that students remain at the College until they could obtain an apprenticeship reflects the reality of the 1830s that an orphan was a child without a residence or family to support them. While the practice of apprenticeship has changed with history, the intended trust purpose of retaining students at Girard until they are able to live on their own has not changed.

Id. at 15 (footnoted citations to the Will, Clause XXI, ¶9, and to a law review article omitted).

## B. *Cy Pres*

Next, the Orphans' Court considered the application of the *cy pres* doctrine, now codified in subsection (a). 20 Pa. C.S. §7740.3(a). The Court concluded the residential program and the high school relate to substantive portions, not administrative portions, of the Will. Orphans' Ct. Op. at 15. The Court stated:

> By the terms of his Will, Stephen Girard made clear that the residential program and the retention of students until roughly fourteen through eighteen years of age enhanced their educational experience. Divorcing the residential

11

> aspect of Girard College and the high school program from a Girard education is inconsistent with the very terms of the Will and the directions of the testator.

Id. at 15-16 (emphasis added).

Citing the RESTATEMENT (SECOND) OF TRUSTS §399 (1959), the Orphans' Court concluded that the *cy pres* doctrine cannot be invoked until it is clearly established that the directions of the donor cannot be carried into effect. Id. at 16. Stated otherwise, *cy pres* should be applied only when it is impossible, impracticable or illegal to carry out the terms of a charitable trust. Id. The Court then rejected the Board's argument that continuing the boarding school and the high school is impracticable.

> The Board argues that continuing the boarding school and the high school is impracticable. Significantly, the Board does not represent that the residential aspect of Girard or the high school are permanently impracticable. Rather, by its Petition the Board seeks to potentially revive both programs at an unknown later date. To support their statement of impracticability, the Board cites to the struggles of Girard's financial resources during the last five to six years. But, as the Board acknowledged, all three of their funding sources are doing substantially better today. Due to this trend, for 2013, the Estate will have a positive cash flow of close to $3.5 million. Thus, the net cash available to the Estate is sufficient to cover the projected budget for the college for the coming year, operating with both a residential program and a high school. Indeed, it is not impracticable for the College to operate with a boarding school and a high school on the current and projected income for this year and in coming years.

Id. (emphasis added, footnoted citation to Petition omitted).

## C. Anticipated Circumstances

Thereafter, the Orphans' Court addressed deviations made in the past to meet changing circumstances, some of which were approved by the Court, and some of which were undertaken without Court approval. Id. at 17. Throughout all the changes, the Girard College residential program has been in place, dating back to the first class in 1848. Id.

Continuing to address changing circumstances, the Orphans' Court described the historical fluctuations in the Estate's financial stability, and the concomitant changes in the number of students enrolled:

> In 1831, Stephen Girard directed that at least 300 students were to be accommodated at the college, but when Girard opened in 1848, the school only housed 95 students. By 1869, the College had expanded due to the success of their real estate holdings, growing to 459 students. In 1948, the student population rose to 1700 students due to large coal royalty payments. Coal royalties fell off dramatically in the 1960s and 70s and by 1985, the school shrunk to 285 students. In the 1990s, the rising stock market caused an increase in the value of the Estate's investment portfolio and the student population rose once again. By 2007, there were 753 students enrolled at Girard. In 2008 a poor real estate market and falling stock values would cause the Estate to make substantial cuts, whittling the student population to approximately 300 students. Through its history, the Board of City Trusts has continually altered the number of students enrolled at Girard based on the available income.

Id. (emphasis added).

13

Finally, the Orphans' Court concluded that the testator *anticipated* that the income available to support Girard College would fluctuate. Id. The Court stated:

> In considering the Board's argument of impracticability, it is also important to note that the testator anticipated that the income available to support Girard would fluctuate. On this point, the testator directed that the income of the Girard Estate was solely to be used to support as many students as possible at the college:
>
> > 'There are, however, some restrictions, which I consider it my duty to prescribe, and to be, amongst others, conditions on which my bequest for said college is made and to be enjoyed, namely; first, I enjoin and require, that, if, at the close of any year, the income of the fund devoted to the purposes of the said college shall be more than sufficient for the maintenance of the institution during that year, then the balance of the said income, after defraying such maintenance, shall be forthwith invested in good securities thereafter to be and remain a part of the capital; but in no event shall any part of the said capital be sold, disposed of, or pledged to meet the current expenses of the said institution, to which I devote the interest, income, and dividends thereof exclusively.'
>
> Elsewhere in his Will Girard wrote that 'as many poor male white orphans, between the ages of six and ten years as the said income shall be adequate to maintain, shall be introduced into the College as soon as possible; and from time to time, as there may be vacancies, or as increased ability from income may warrant, others shall be introduced.' Girard, cognizant of the possibility that the income of his Estate would rise and fall, specifically provided that the size of Girard College would be determined by the income available to support it. The

14

> Will speaks for itself and establishes the settlor's intention to create a boarding school for as many students as income would provide for the purpose.

Id. at 17-18 (emphasis added, footnoted citations to the Will, Clause XXI, ¶¶9, 4 omitted). Ultimately, the Court concluded that "[a]pplication of the *cy pres* doctrine to make such fundamental changes is not justified by the current cash flow and projected income of the Estate." Id. at 19 (emphasis added).

Thus, the Orphans' Court denied the Board's Petition without prejudice. After denial of exceptions, appeal was taken to this Court.

### III. Issues

As the appellant, the Board raises three issues for our consideration. First, it questions whether the Orphans' Court erred in refusing to apply the doctrine of administrative deviation, codified at 20 Pa. C.S. §7740.3(c). Second, it asks whether the Court erred in refusing to apply the doctrine of *cy pres*, codified at 20 Pa. C.S. §7740.3(a). Third, it questions whether the financial circumstances confronting the Estate justify granting the requested modifications under either of the foregoing legal theories.

Although the Office of Attorney General supported the Board in the proceedings before the Orphans' Court, its position as nominal appellee in this appeal is different. It frames the issue as follows: "Was the eventual denial of the Board's [Petition] a reasonable exercise of judicial discretion, consistent with applicable law, notwithstanding the Attorney General's general support for the [P]etition in the Orphans' Court?" Br. of Appellee/Participant Commonwealth of

15

Pennsylvania, Office of Attorney General, Charitable Trusts and Organizations Section, at 5.

"Our review of this case is guided by the principles that the scope of appellate review of a decree in equity is particularly limited and that the findings of the Chancellor will not be reversed unless it appears that the Chancellor clearly committed an abuse of discretion or an error of law." In re Barnes Found., 684 A.2d 123, 130 (Pa. Super. 1996) (quoting Dudash v. Dudash, 460 A.2d 323, 326 (Pa. Super. 1983)) (internal citations omitted).

## IV. Discussion
### A. Administrative Provisions
#### 1. Contentions

The Board contends the Orphans' Court improperly refused to apply the doctrine of administrative deviation based on its erroneous determination that Girard College's residential and high school programs are essential purposes under the Will. It asserts that a review of the plain language of the Will and the historical treatment of the College by the courts, in addition to present and evolving societal circumstances, demonstrates that the programs are subordinate and ancillary to Stephen Girard's dominant and primary purpose of maintaining an institution for the education of disadvantaged children in perpetuity.

The Office of Attorney General contends there are no grounds to reverse the Orphans' Court. The Court had to make an independent determination, and it was not bound by the position taken below by the Office of Attorney

16

General.  As the Orphans' Court found, administrative deviation was not warranted because what the Board proposed would impermissibly remake the Girard Trust, which always contemplated a boarding school.

The Girard College Alumni Association (Alumni Association), as *amicus curiae*, reminds us that Stephen Girard's vision, to educate disadvantaged children in supervised residence until graduation into a productive life, was distinctive for its time.  The Alumni Association asserts that to dilute that vision by substitution of non-residential day schooling only to the eighth grade, even if temporarily and even if offered to more students, would transgress Mr. Girard's primary purpose and diffuse that beneficence.  The Alumni Association urges this Court to consider the Board's long-term forecasts as speculative, and affirm the Orphans' Court decree, which was entered without prejudice for future consideration of proposals.

## 2. Analysis

As now codified at 20 Pa. C.S. § 7740.3(c), the rule of administrative deviation is: "A court may modify an administrative provision of a charitable trust to the extent necessary to preserve the trust."  The phrase "administrative provision" is not further defined.

A leading Pennsylvania case on the doctrine of administrative deviation is In re Barnes Foundation, which was decided before the codification of 20 Pa. C.S. §7740.3(c) in 2006.  In Barnes Foundation the Superior Court quoted RESTATEMENT (SECOND) OF TRUSTS §381 (1959) ("Deviation from Terms of the

17

Trust"). The Court also relied on a learned treatise to define administrative provisions subject to deviation as "the details of administration which the settlor has prescribed in order to secure the more important result of obtaining for the beneficiaries the advantages which the settlor stated he wished them to have." Barnes Found., 684 A.2d at 130 (quoting GEORGE GLEASON BOGERT & GEORGE TAYLOR BOGERT, THE LAW OF TRUSTS AND TRUSTEES §561 at 27). The Court emphasized that "deviation is not based on mere convenience, but on the necessity of effecting a change in a situation where compliance with the terms of the trust 'would defeat or substantially impair the accomplishment of the purpose of the trust.'" Id. at 130-31 (quoting Colin McK. Grant Home v. Medlock, 349 S.E.2d 655, 659 (S.C. Ct. App. 1986)).

In his important law review article, *Administrative and Dispositive Powers in Trust and Tax Law; Toward a Realistic Approach*, 36 U. Fla. L. Rev. 957 (1984), Professor Martin D. Begleiter offered a concrete distinction between administrative and dispositive provisions. He defined an administrative provision or power as one that concerns the management of property, is incidental to the substantive terms of the transfer, and is not directly substantive. Id. at 958-59. The definition would include investment powers, powers to appoint successor fiduciaries in inter vivos trusts, powers to sell, lease or mortgage, powers to hold separate shares *in solido* and to hold property in bearer form, powers to collect and pay debts and taxes, powers to make tax elections, clauses relieving the trustee of liability, and similar management clauses. Id. at 959 n.6. In contrast, a dispositive power or provision directly affects the substantive provisions of the trust, primarily those provisions identifying the beneficiaries and setting forth their interests. Id. at

18

959.  The theme of Professor Begleiter's work is that deviation is permissible only if it does not affect the beneficiaries' interests.  Id. at 1001.[6]

Under either the Superior Court's definition of administrative provisions in Barnes Foundation, or Professor Begleiter's definition, we discern no error in the Orphans' Court's resolution of this issue.  Relying on references to providing "maintenance," "residence" and "lodging" in Will Clauses XX and XXI, quoted near the beginning of this opinion, the Orphans' Court properly concluded

---

[6] In addition, Professor Begleiter traced the development of the administrative deviation doctrine from an 1862 case out of Illinois, Curtiss v. Brown, 29 Ill. 201 (1862), to more recent decisions.  He discerned an interesting trend:

> The doctrine of deviation began as a narrow emergency doctrine developed by necessity to prevent the failure of a trust.  Originally it focused on the needs of the beneficiary or the possible reduction in the trust corpus as to the extent that the trust assets became practically worthless.  The focus gradually changed to what the court believed to be the testator's dispositive plan.  Later, the doctrine was expanded to include cases where a serious impairment of value of one asset of the trust existed, though the trust corpus remained of great value and no need or burden on the beneficiaries was proven.  Even the stated purpose of the testator could be ignored.
>
> Recent cases have focused on changed circumstances, not of the trust, but of national economic conditions.  The trust need not have declined in value, nor need the property be unproductive to invoke deviation.  Courts require only a change in national or world-wide economic conditions threatening the purchasing power of the trust's assets.  Absent from these decisions is any detailed inquiry into the testator's purpose. … Deviation from administrative provisions has therefore become a broad doctrine, though occasionally tempered by some requirement of need by the beneficiaries or impairment of the trust assets.

Martin D. Begleiter, *Administrative and Dispositive Powers in Trust and Tax Law; Toward a Realistic Approach*, 36 U. Fla. L. Rev. 957, 969 (1984) (footnotes omitted).

that the residential program at Girard College did not involve a non-substantive detail of administration. Further, the Orphans' Court was justified in concluding that Will references to "residence" and "lodging" encompass provisions of the Trust setting forth part of the beneficiaries' interests, and as such, are dispositive provisions.

Similarly, the Orphans' Court properly concluded that the high school grades did not involve a non-substantive detail of administration. The Court quoted Will Clause XXI, ¶9, to support its conclusion that Girard's intended trust purpose was "of retaining students at Girard until they are able to live on their own …." Orphans' Ct. Op. at 15. Because we agree that this Will provision identifies part of the beneficiaries' interests, rather than some detail of management, no error is evident.

The Board's reliance on past modifications does not compel a different result. The Orphans' Court correctly disposed of this argument by noting that one modification was made without Court approval (2009 suspension of weekend residential program), and other modifications related to constitutional questions (admission of girls and minorities). See Orphans' Ct. Op. at 17. Nevertheless, the residential program remained in place since the College's first class in 1848. Id. Under these circumstances, we agree with the Orphans' Court that past modifications do not control the current controversy.

20

## B. *Cy Pres*

### 1. Contentions

The Board also contends the Orphans' Court erred by denying modification under the doctrine of *cy pres*. It asserts the fundamental purpose of Stephen Girard – the maintenance of an educational institution for children of lesser means – is threatened by existing financial circumstances. The purpose of the Will has clearly become impractical and, unless addressed now, that purpose will be ultimately frustrated. If modifications are not permitted, the Residuary Fund, the primary source of revenue to support the College, will be depleted. The Orphans' Court's myopic focus on "this year" or the "coming years" was error and did not acknowledge the *cy pres* doctrine. According to the Board, a decision on modification cannot be deferred, and the Court abused its discretion in doing so.

The Office of Attorney General counters that *cy pres* relief was not warranted because the College's residential and high school programs were not "impracticable" given recent promising financial trends. In essence, the Board asked for a *cy pres* remedy preemptively, out of concern that Girard College's complicated and unquestionably precarious financial situation may deteriorate. But, the Orphans' Court has wide discretion, and it is not obligated to grant *cy pres* relief at the first whiff of trouble. Moreover, there is not necessarily such a thing as "temporary" *cy pres*.

The Alumni Association claims that the Board did not provide sufficient evidence that *cy pres* is applicable here. The Alumni Association highlights that the College continues to operate, changes in operations were made

21

and further changes can be made, and financial conditions have improved. It asserts that the proposed modifications are more a matter of the trustee's convenience than a necessity at this time.

## 2. Analysis

As now codified at 20 Pa. C.S. §7740.3(a), the doctrine of *cy pres* is, in pertinent part: "if a particular charitable purpose becomes unlawful, impracticable or wasteful … the court shall apply cy pres to fulfill as nearly as possible the settlor's charitable intention, whether it be general or specific."

The Orphans' Court determined that, given more recent financial trends, "the net cash available to the Estate is sufficient to cover the projected budget for the college for the coming year, operating with both a residential program and a high school. Indeed, <u>it is not impracticable to operate with a boarding school and a high school on the current and projected income for this year and in coming years</u>." Orphans' Ct. Op. at 16 (emphasis added).

For several reasons, we discern neither error nor abuse of discretion in the determination of no current impracticability. First, as discussed in the previous section, we see no error in the Orphans' Court's determination that, based on express terms in the Will, both a residential program and a high school program were important parts of Stephen Girard's charitable gift. The Court properly rejected the Board's too-broad definition of intent as an "educational institution for children of lesser means."

22

Second, it was well within the Orphans' Court's discretion to give promising near-term financial projections greater weight than the dire long-term predictions offered by the Board. This is especially true where the Court tempered its resolution by permitting future application for modification. In the absence of binding authority limiting the Orphans' Court's broad discretion in similar circumstances, we decline to interfere with its judgment.

## C. Anticipated Circumstances

### 1. Contentions

Further, the Board assigns error in the Orphans' Court's focus on the financial evidence of "this year" and "coming years." The Board contends that the issue before the Court was not whether the Estate had sufficient funds to operate with a boarding school and high school for one or two years, but rather, whether the Estate will have sufficient financial resources to operate Girard College in perpetuity, as Stephen Girard desired. By limiting the scope of its review to 2013 and 2014, the Orphans' Court failed to appreciate the critical financial challenges facing the Estate that inevitably will lead to an inability to continue operating the College as an educational institution. This limited review was error, according to the Board.

The Board contends that in particular, the Orphans' Court failed to account for necessary infrastructure improvements, failed to account for the additional $1 million contributed to the sinking fund beginning in 2015, failed to account for the likelihood and impact of tenancy loss at ARAMARK Tower, failed to account for an increase in capital expenditures for properties held in the Estate's

real estate portfolio, and improperly ignored Brownstein's testimony and report. The Board urges that the record supports the requested modifications as the means of preserving Girard College going forward.

The Office of Attorney General points out that the Board's argument on this last issue is unsupported by any legal authority and amounts to a lengthy critique of how the Orphans' Court weighed, analyzed and interpreted the evidence. Nevertheless, the Court did its job. It is apparent from the Orphans' Court's opinion that it read the court filings, listened to the hearing witnesses, reviewed the documentary evidence, and arrived at a reasoned conclusion, based upon the entire record. That is all any litigant can expect.

The Office of Attorney General also reminds us that the Orphans' Court concluded, more or less along the lines of Amicus Mannion's position, that it would be appropriate to continue monitoring the situation with Girard College for at least a while longer. By denying the Petition without prejudice, the Court left the door open to revisiting the Board's concerns should seemingly promising financial trends not endure. That was a thoughtful, judicious approach.

The Alumni Association argues that the Orphans' Court applied the required scrutiny through its court-appointed amicus and in its independent analysis of the record. The Court found the proposed modifications to be misguided in view of the Will and in view of the information supplied by the Board. Beyond that, the precedents that the Board seeks to set regarding the doctrines of administrative deviation and *cy pres* exceed current law. Mere long-

24

term projections and speculation, even based upon expert opinion, should not become the basis for a present application of these doctrines.

## 2. Analysis

RESTATEMENT (SECOND) OF TRUSTS Section 381 (1959), entitled "Deviation from Terms of the Trust," provides (with emphasis added):

> <u>The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court</u> that compliance is impossible or illegal, or <u>that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.</u>

"In order to permit deviations from the administrative terms of a trust, courts generally require the presence of two elements: '(1) <u>unforeseen and unforeseeable change of circumstances</u>, and (2) a frustration of the settlor's main objectives by this change, if strict obedience to the settlor['s] directions were required.'" <u>Barnes Found.</u>, 684 A.2d at 130 (quoting GEORGE GLEASON BOGERT & GEORGE TAYLOR BOGERT, THE LAW OF TRUSTS AND TRUSTEES §561 at 230) (emphasis added).

Such was the existing law of Pennsylvania prior to the adoption of 20 Pa. C.S. §7740.3, entitled "Charitable Trusts – UTC 413." This provision is similar to Section 413 of the Uniform Trust Code (2000). <u>See</u> 20 Pa. C.S. §7740.3, Historical and Statutory Notes. Indeed, the Joint State Government Committee Comment to the Section states, "Subsection (c) ["Administrative deviation"] codifies existing Pennsylvania law." 20 Pa. C.S. §7740.3, Jt. St. Gov.t Comm. Comment—2005.

25

For context, RESTATEMENT (THIRD) OF TRUSTS Section 66(1) (2003), entitled "Power of Court to Modify: Unanticipated Circumstances," covers similar material and provides (with emphasis added):

> (1)    The court may modify an administrative or distributive provision of a trust, or direct or permit the trustee to deviate from an administrative or distributive provision, if because of circumstances not anticipated by the settlor the modification or deviation will further the purposes of the trust.

Thus, under the RESTATEMENT (THIRD) Section 66(1), the so-called "equitable deviation" doctrine, a court may modify both administrative and distributive provisions. See id., cmt., subsection (1).  Further, the stated rule does not require changed circumstances; rather, it is sufficient that the settlor was unaware of the circumstances in establishing the terms of the trust.  Id.

Here, the Orphans' Court determined that "the testator anticipated that the income available to support Girard would fluctuate."  Orphans' Ct. Op. at 17.  Further, the Court stated, "Girard, cognizant of the possibility that the income of his Estate would rise and fall, specifically provided that the size of Girard College would be determined by the income available to support it."  Id. at 18.  The Court relied on the Will, Clause XXI, ¶¶ 4, 9.  Id.  This finding of anticipated circumstances, supported by terms of the Will, precludes deviation under RESTATEMENT (SECOND) OR RESTATEMENT (THIRD) OF TRUSTS.  The Board makes no legal argument to the contrary.

Given the finding of anticipated circumstances, the Board's fact-heavy, law-light argument on the Orphans' Court's short-term financial focus

26

cannot support a reversal, regardless of whether the programs in question pertain to administrative or distributive aspects of the Will. Similarly, given the Court's determination of no current impracticability (discussed above), the doctrine of *cy pres* will not support reversal.

Nevertheless, we carefully examined the Board's factual arguments. We conclude that they lack merit. Contrary to the Board's contentions, the Orphans' Court considered the cost of infrastructure improvements, Orphans' Ct Op. at 9, and of additional contributions to the sinking fund, id. at 10 n.57.

Further, the Court was clearly aware of the possible future tenancy loss/substantial tenant improvements at ARAMARK Tower. See N.T. at 203-04; R.R. at 305a (testimony of Brownstein, colloquy with Court). See also N.T., 10/30/14 at 24-28; R.R. at 732a-33a (argument on exceptions, colloquy with Court); Post Trial Filing of James F. Mannion, Amicus Curiae, at 7; R.R. at 712a. Similarly, the Court was well aware of Howard Brownstein's expert opinion that the Board should not wait to implement the proposed modifications. N.T. at 200-05; R.R. at 304a-06a (testimony of Brownstein, colloquy with Court). Regarding these future uncertainties for the real estate portfolio, the Orphans' Court was obviously, and consistently, skeptical about the scenarios as presented by the Board. Thus, as to these points, the record supports the Court's conscious decision not to afford great weight to the Board's evidence.

## V. Conclusion

Like the Orphans' Court, this Court commends the Board for beginning to confront the myriad of financial, educational and institutional challenges currently facing Girard College. <u>See</u> Orphans' Ct. Op. at 19. Nevertheless, we discern no legal or factual basis to disturb the considered judgment of the Orphans' Court; therefore, we affirm.

_____

ROBERT SIMPSON, Judge

Judge Brobson did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Estate of Stephen Girard, Deceased :
Trust for Girard College :
                                   :     No. 2254 C.D. 2014
Appeal of: Board of Directors of City :
Trusts, Trustee of the Trust under Will :
of Stephen Girard for Girard College :

# **O R D E R**

**AND NOW**, this 21st day of January, 2016, the Final Decree of the Orphans' Court Division of the Court of Common Pleas of Philadelphia County, dated November 14, 2014, dismissing exceptions and affirming the Decree of August 21, 2014, is hereby **AFFIRMED**.

_____
ROBERT SIMPSON, Judge